1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

| | |
|---|---|
| OLYMPUS SPA, et al., | CASE NO. 22-CV-00340-BJR |
| Plaintiffs, | ORDER GRANTING MOTION TO DISMISS |
| v. | |
| ANDRETA ARMSTRONG, | |
| Defendant. | |

11
12
13
14
15
16

    This matter comes before the Court on Defendant Andreta Armstrong's[1] Motion to

17

Dismiss. Dkt. No. 13. On June 2, 2023, the Court heard oral argument on the motion, and after

18

thorough review of the record and the governing law, the Court grants the motion and dismisses

19

Plaintiffs' complaint without prejudice. Dkt. No. 1.

20
21
22
23

[1] Plaintiffs originally sued Sharon Ortiz in her official capacity as the Executive Director of the Washington State Human Rights Commission. *See* Dkt. No. 1 at 1. Ms. Ortiz has since retired, and Ms. Armstrong is now the Executive Director of the Commission. Dkt. No. 13 at 7 n.1. The Court therefore substitutes Director Armstrong as the defendant in this suit and directs the Clerk to update the case caption accordingly. *See* Fed. R. Civ. P. 25(d).

24

# I.    BACKGROUND

This case involves a First Amendment challenge to Washington's Law Against Discrimination (the "WLAD"). *See* Wash. Rev. Code § 49.60 *et seq.* Before delving into the facts of the dispute, the Court will provide some historical and statutory context.

A.    Public Accommodation Laws, the WLAD, and the Washington State Human Rights Commission

The WLAD "is a regulatory law enacted under the legislature's police power to promote the health, peace, safety, and general welfare of the people of Washington." *Ockletree v. Franciscan Health Sys.*, 317 P.3d 1009, 1012 n.2 (Wash. 2014) (plurality opinion); *see* Wash. Rev. Code § 49.60.010. To borrow from the Supreme Court, it is one of "many public accommodations statutes across the Nation"—laws that "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination[.]" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 571–72 (1995) (public accommodation laws "do not, as a general matter, violate the First or Fourteenth Amendment"); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("[I]t is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law.").

Washington lawmakers have expanded the WLAD's reach over the years to "bar discrimination on the basis of age, sex, sexual orientation, and disability, and to incorporate a private right of action for employees and persons who use public accommodations." *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1064 (Wash. 2021). With this expansion, "the potential for conflict between state public accommodation laws and the First Amendment rights of organizations has increased." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657 (2000); *see, e.g.*,

1    *Green v. Miss United States of Am., LLC*, 52 F.4th 773 (9th Cir. 2022) (forcing pageant to accept

2    transgender woman pursuant to Oregon's public accommodation law violated First Amendment);

3    *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1176–88 (10th Cir. 2021) (application of Colorado's

4    public accommodation law to website designer who refused to create websites celebrating same-

5    sex marriages did not violate First Amendment). Indeed, the Washington Supreme Court recently

6    confronted—and dispensed with—a florist's First Amendment challenge to the WLAD. *See State*

7    *v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1224–36 (Wash. 2019). It is against this backdrop that

8    the suit at hand arises.

9           As relevant here, the WLAD recognizes "[t]he right to be free from discrimination because

10   of . . . sexual orientation[.]" Wash. Rev. Code § 49.60.030(1). This general right includes "[t]he

11   right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of

12   any place of public resort, accommodation, assemblage, or amusement[.]" *Id.* § 49.60.030(1)(b);

13   *see also id.* § 49.60.215 (declaring discrimination based on sexual orientation an "unfair

14   practice").[2] The statute defines "sexual orientation" as "heterosexuality, homosexuality,

15   bisexuality, and gender expression or identity." *Id.* § 49.60.040(27). And "gender expression or

16   identity" is further defined as "having or being perceived as having a gender identity, self-image,

17   appearance, behavior, or expression, whether or not that gender identity, self-image, appearance,

18   behavior, or expression is different from that traditionally associated with the sex assigned to that

19   person at birth." *Id.*

20

21

22   ──────────────────────

23   [2] Under the WLAD, "full enjoyment of" encompasses "the right to purchase any service, commodity, or article of personal property offered or sold on, or by, any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges or any place of public resort, accommodation, assemblage, or amusement, without acts directly or indirectly causing persons of any particular . . . sexual orientation . . . to be treated as not welcome, accepted, desired, or solicited." Wash. Rev. Code § 49.60.040(14).

24

1       Although the WLAD provides a private right of action for "[a]ny person deeming himself

2  or herself injured" by a violation of the statute, *see id.* § 49.60.030(2), the legislature also created

3  the Washington State Human Rights Commission (the "Commission") to superintend enforcement

4  of the law, *see id.* § 49.60.010 (vesting the Commission with "general jurisdiction and power" to

5  eliminate and prevent discrimination). The Commission does so through an administrative scheme.

6  First, any person "aggrieved by an alleged unfair practice" may file a complaint with the

7  Commission identifying "the person alleged to have committed the unfair practice and the

8  particulars thereof[.]" *Id.* § 49.60.230(1)(a). The Commission then "prompt[ly] review[s] and

9  evaluat[es] the complaint" to determine whether the facts stated therein constitute an "unfair

10  practice." *Id.* § 49.60.240(1)(a). If they do not, "a finding of no reasonable cause may be made

11  without further investigation." *Id.* If, however, the facts could "constitute an unfair practice" under

12  the WLAD, the Commission conducts "a full investigation and ascertainment of the facts[.]" *Id.*

13       The results of the full investigation must then be "reduced to written findings of fact" and

14  the Commission issues a formal finding "that there is or that there is not reasonable cause for

15  believing that an unfair practice has or is being committed." *Id.* § 49.60.240(2). Both the

16  complainant and the target of the complaint (the "respondent") receive a copy of the formal

17  findings. *Id.* Where, as in this case, the Commission finds reasonable cause to believe an unfair

18  practice has been committed or remains afoot, it "shall immediately endeavor to eliminate the

19  unfair practice by conference, conciliation, and persuasion." *Id.* § 49.60.240(3). The next step is

20  particularly relevant here: "If an agreement is reached for the elimination of such unfair practice

21  as a result of such conference, conciliation, and persuasion, the agreement shall be reduced to

22  writing and signed by the respondent, and an order shall be entered by the commission setting forth

23  the terms of said agreement." *Id.* Any such conciliation agreement "shall be an agreement between

24  the respondent and the complainant and shall be subject to the approval of the commission." *Id.* If

the parties cannot reach a conciliation agreement, the dispute is referred for a hearing before an administrative law judge, following which the parties may seek judicial review. *See id.* § 49.60.250.

B.   Olympus Spa and Other Plaintiffs

Myoon Woon Lee has owned and operated Olympus Spa for over 20 years. Dkt. No. 1 at 4. Joining him and his business as plaintiffs in this suit are Sun Lee (the president of Olympus Spa), Jane Doe Employees 1-3, and Jane Doe Patron. *See id.* at 3. The Olympus Spa is a Korean spa "specifically designed for women," and the services offered there "are closely tied to the Korean tradition," meaning patrons are "require[d] . . . to be naked" during certain services. *Id.* at 3–4; *see also id.* at 5 ("It is Olympus Spa's business purpose to provide traditional Korean kiln saunas and exfoliation therapy experiences."); Dkt. No. 1-2 at 3 ("Our spa is designed specifically for women and our mission is to restore and rejuvenate women's physical health as well as spiritual health."). The facilities include "a bath area containing multiple whirl-pools, a traditional Korean body-scrub service area, standing showers, sit-down showers, a steam room, and a dry sauna." Dkt. No. 1 at 4. As noted, patrons are "typically fully naked" while utilizing these areas and thus "have visual access" to other nude patrons. *Id.* at 5. Nor is nudity optional. It is allegedly "required for certain procedures called 'Seshin'" pursuant to Korean tradition. *Id.* According to Plaintiffs, female patrons receiving a Korean body scrub "must do so unclothed," and all employees who provide those scrubs ("ddemiri") are women. *Id.*

Olympus Spa maintains a "female-only policy" under which it restricts admission to women—or, more specifically, individuals who "physically present[] in the nude as . . . female." *Id.* at 5, 7. It apparently advertised this entry policy on its website with the following language: "Biological women are welcome[.] It is the policy of Olympus Spa not to discriminate on the basis of race, color, national original, sex, age, or disability in its programs or activities, as required by

1   applicable laws and regulations." Dkt. No. 1-3 at 13. Olympus Spa thus admits transgender women

2   only if they have "gone through post-operative sex confirmation surgery." Dkt. No. 1 at 5, 7.

3   Plaintiffs attribute the policy to their "traditional, theologically conservative" Christian values. *Id.*

4   at 5. They believe in "modesty as between the sexes" and "hold the conviction that a male and

5   female should not ordinarily be in each other's presence while in the nude unless married to each

6   other." *Id.*; *see also* Dkt. No. 1-2 at 4 ("Women are in a vulnerable position when they are

7   unclothed and/or having treatment while unclothed and we seek to ensure that they feel their

8   privacy and rights are respected. This is a biblical principle from 1 Peter 3:7, 1 Timothy 3:1-7, 1

9   Timothy 5:2, Phillipians 4:3, Genesis 1:27, Proverbs 31:17, Phillipians 2:3 and more."). The Jane

10   Doe Employees accordingly refuse to perform massages or body scrubs on naked men. Dkt. No.

11   1 at 5–6. And Jane Doe Patron, a Christian "who frequently receives treatments at Olympus Spa,"

12   likewise "believes that men and women should not be viewing each other's naked bodies unless

13   married to each other." *Id.* at 6.

14        There have nonetheless been "incidents" in which men have "penetrate[d] the interior" of

15   an Olympus Spa facility. *Id.* For example, six years ago a customer alerted employees that an

16   individual "with male genitals was roaming around the spa." *Id.* at 6–7. The on-duty manager

17   investigated the issue and determined that a "transgender woman with male genitals" was using

18   the facilities. *Id.* at 7. Although the transgender patron left after the manager explained the female-

19   only policy, other customers requested refunds and left the spa. *Id.* Plaintiffs allege that several

20   such incidents have occurred in which patrons "noticed male genitals exposed in the locker room

21   and/or pool area" and, as a result, experienced "humiliation, trauma, and rage[.]" *Id.* Those patrons

22   apparently demanded refunds and never returned. *Id.*

23

24

ORDER GRANTING MOTION TO DISMISS - 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     C.     <u>Haven Wilvich and the Commission Complaint</u>

     In February 2020, Haven Wilvich—a transgender woman who "identifies as a woman" but "is biologically male and has not undergone sex reassignment surgery"—filed a complaint with the Commission. *Id.*; *see* Dkt. No. 1-3 at 4 (Notice of Complaint of Discrimination indicating that complaint was filed on February 13, 2020). Ms. Wilvich's complaint alleges that she went to Olympus Spa in January 2020 in search of services but was discriminated against "because of [her] sexual orientation" and "denied . . . equal services based on [her] sexual orientation." Dkt. No. 1-3 at 2. According to Ms. Wilvich, she was denied services and told "that transgender women without surgery are not welcome because it could make other customers and staff uncomfortable." *Id.*[3]

     Although Ms. Wilvich's complaint is dated May 2020, it was not until November 2020 that the Commission mailed an initial Notice of Complaint of Discrimination to Olympus Spa. Dkt. No. 1 at 8; Dkt. No. 1-3 at 4. This first notice required "[n]o action" from Olympus Spa because it was "for timely notification purposes only[.]" Dkt. No. 1-3 at 4. As for the circumstances and basis of the complaint, the notice has a box checked next to "sexual orientation" and summarizes the issues as follows: "Complaint alleges discrimination based on Sexual Orientation." *Id.* The notice also directs Olympus Spa to use the listed Commission complaint number "[f]or further inquiry on this matter" and provides contact information for "[y]our written response, position statement,

---

[3] Plaintiffs dispute the veracity of Ms. Wilvich's complaint. In his declaration, Olympus Spa President Sun Lee suggests that Ms. Wilvich would not have been denied entry to the spa because patrons "are checked in using electronic check in stations," patrons "do not interface with owners," and, "[g]enerally speaking," employees "have no idea if a preoperative transgender violates the policy of the spa until they are undressed." Dkt. No. 1-2 at 2. Olympus Spa performed an internal investigation "to determine when the alleged discrimination happened and . . . who denied entry" to Ms. Wilvich but "found no record" of Ms. Wilvich having been at either the Tacoma or Lynnwood locations: "We keep records via an electronic sign in portal of all individuals who enter the spa. They fill out their information prior to being admitted in the waiting area. Haven Wilvich would have submitted such information[.]" *Id.* at 2–3. Because Olympus Spa employees have no "recollection of speaking with a Haven Wilvich," Mr. Lee concludes that Olympus Spa, its owners, and its employees have been "targeted by Haven Wilvich for [their] beliefs/creed." *Id.* at 3.

response to our request for information, or any inquiry you may have[.]" *Id.* The Commission simultaneously issued a letter advising Olympus Spa of its duty "to preserve all evidence that may be relevant to this complaint" and warning that refusal to turn over requested information would result in "a subpoena and order compelling production[.]" *Id.* at 5.

In March 2021, the Commission served Olympus Spa with a second Notice of Complaint of Discrimination. *Id.* at 7. This time it requested "a written response" to Ms. Wilvich's complaint, "including a statement of [Olympus Spa's] position o[n] the issues covered by th[e] Complaint, with copies of any supporting documentation[.]" *Id.* The second notice also apprised Olympus Spa of the Commission's early resolution services: "The [Commission] may assist the parties in early resolution of this Complaint through joint fact finding conferences and/or settlement negotiation which gives the parties an opportunity to resolve the issues . . . without extensive investigation or expenditure of resources." *Id.* Olympus Spa was invited to contact the assigned Civil Rights Investigator—here, Madison Imiola—if it was interested in participating in the settlement services. *Id.* Enclosed in the second notice was a copy of Ms. Wilvich's May 2020 complaint. *Id.* at 7–8.

D.   Olympus Spa Disputes the Complaint

In March 2021, President Sun Lee authored a letter to the Commission in which he defended Olympus Spa's "women-only rule" and denied any violation of the WLAD. *Id.* at 10. There he set forth Olympus Spa's history and purpose as a "family-owned women's Korean traditional health spa" and explained that "[n]udity is required for certain procedures[.]" *Id.* ("We firmly believe it is essential for the safety, legal protection, and well-being of our customers and employees that we maintain adherence to this adaptation of a females-only rule."). Mr. Lee then detailed the "cultural underpinnings" of the services offered at Olympus Spa—services "closely

tied to the Korean tradition known as 'jjimjilbang'[.]" *Id.*[4] In Olympus Spa's view, "nudity and females-only . . . cannot be segregated from the cultural requirements for 'seshin' services[.]" *Id.* at 11. Citing Washington's laws on lewd conduct, facilitating lewd conduct, and public indecency, Mr. Lee conveyed his fear that exposing female customers (especially minors) to male genitalia could subject Olympus Spa to criminal penalties. *Id.* at 11–12. He concluded the letter by indicating that Olympus Spa was "willing to consider a review of [its] current biological females only policy" with one caveat: "we are unwilling to remake the 'jjimjilbang' haven we have worked so hard over many years to build and preserve, simply for the sake of promoting gender neutrality." *Id.* at 12.

Ms. Imiola responded two weeks later. *See id.* at 15–16. After reviewing the evidence and Mr. Lee's letter, she determined that Olympus Spa's "biological women" policy violates the WLAD because it discriminates based on gender identity. *Id.* at 15. More specifically, Ms. Imiola opined that the policy "denies services to transgender women who have not had surgery . . . because their physical appearance is not 'consistent' with the traditional understanding of biological women." *Id.* She further observed that the WLAD "does not use genitals to define gender identity and . . . recognizes that a person's gender identity can be different from the biological sex assigned to that person at birth." *Id.* at 15–16 ("However, Olympus Spa's 'biological women' policy focuses on the genitals of patrons rather than allowing transgender women to access your facilities based on their gender identity[.]"). Ms. Imiola's letter served a dual purpose. In addition to stating her findings, she wrote "to offer Olympus Spa the opportunity to enter into a Pre-Finding Settlement (PFS) Agreement." *Id.* at 15. As her letter explains, such settlement agreements are "used to resolve the issues of a complaint prior to completing the investigative process." *Id.* Ms. Imiola

---

[4] "Jjimjilbang" is Korean for "steamed-quality room." Dkt. No. 1-3 at 10.

guaranteed that a PFS Agreement would preclude Ms. Wilvich from taking any further legal action with respect to the complaint allegations, made clear that such an agreement would not require an admission of guilt, and promised that the Commission "would take no further action on the issues of the complaint." *Id.* In sum, a PFS Agreement was Olympus Spa's "opportunity" to "revise [its] policies and practices," bring itself "into compliance with the law, avoid the costs of non-compliance and litigation, and reduce the likelihood of future complaints." *Id.* Ms. Imiola concluded her letter with a threat: "If I do not hear from you within ten business days, I will conclude that Olympus Spa is not interested in settling the case and will proceed accordingly by preparing the case for referral to the Attorney General's Office for prosecution." *Id.* at 16.

Mr. Lee did not respond for over a month. *Id.* at 18. When he finally did, it was to inform Ms. Imiola that Olympus Spa had no record of Ms. Wilvich's visit. *Id.* Nor could staff members recall any allegedly discriminatory interaction with any customer. *Id.* Mr. Lee asked whether Ms. Wilvich could provide more information about her January 2020 experience so that Olympus Spa could better "assist in ensuring that no person, especially Haven, feels discriminated against." *Id.* Ms. Imiola replied that the Commission had already made its determination: Olympus Spa's "biological women" policy violates the WLAD. *Id.* at 20. Ms. Imiola encouraged Olympus Spa to "strongly consider entering into a Pre-Finding Settlement (PFS) agreement" and reiterated the benefits of doing so: "an opportunity to avoid the costs of non-compliance and litigation; a reduction in the likelihood of future complaints against Olympus Spa; and the ability to resolve the complaint without an admission of guilt or formal findings of fact entered against Olympus Spa." *Id.* And she again warned that declining a PFS agreement would result in "referral to the Attorney General's Office for prosecution." *Id.*

1

E.    Olympus Spa Enters into a Pre-Finding Settlement Agreement

2    Mr. Lee subsequently indicated Olympus Spa's desire to correct its allegedly

3    discriminatory policy and requested "the Pre-Finding Settlement details." *Id.* at 22. Although he

4    continued to dispute the veracity of Ms. Wilvich's complaint, Mr. Lee informed Ms. Imiola that

5    the "biological women" policy had been removed from Olympus Spa's website. *Id.* Ms. Imiola

6    responded in a letter setting forth—and seeking Olympus Spa's agreement to—three settlement

7    terms that the Commission identified as "of interest" in "moving forward with the resolution of

8    this case." *Id.* at 24. First, Olympus Spa would be required to "remove references to 'biological

9    women'" from its website. *Id.* Ms. Imiola recognized that Olympus Spa had "already addressed"

10    this term and promised that the PFS agreement would "memorialize" the change. *Id.* Second, the

11    Commission would provide Olympus Spa with "training materials" to ensure its understanding of

12    and future compliance with the WLAD. *Id.* As for the third and final term, the Commission wished

13    to review all Olympus Spa policies to ensure compliance with the WLAD. *Id.* Olympus Spa agreed

14    to these terms. *See id.* at 26.

15    Although the Commission agreed to close the Wilvich complaint, it retained the right to

16    "investigate and prosecute th[at] complaint" if Olympus Spa failed to comply with any terms of

17    the agreement. *Id.* at 36; *see also id.* at 37 ("[T]he Commission may take action including, among

18    other remedies, continuing its investigation or bringing an action in court for specific performance

19    of this agreement."). And the central terms of the agreement are as previewed in Ms. Imiola's

20    letter. Olympus Spa was required to complete WLAD training within 60 days. *Id.* It was similarly

21    allotted 60 days to "[i]mplement and/or revise existing company policies as necessary to ensure

22    their compliance with the [WLAD]." *Id.* at 36 ("Respondent agrees that . . . it has adopted new

23    language on its website reflecting a non-discriminatory policy[.]"). And last, the PFS agreement

24    reserves Olympus Spa's right to challenge the Commission's application of the WLAD: "This

1    agreement does not preclude Respondent, its employees, or patrons from exercising their

2    constitutional rights to . . . brin[g] a legal challenge as to the constitutionality of any term or

3    provision in this agreement [or] the operative statutes, including but not limited to [the WLAD.]"

4    *Id.* at 37. In October 2021, the Commission issued a notice of final agency action and officially

5    closed the Wilvich complaint. *See id.* at 34–39.

6        F.    Olympus Spa Sues

7        In March 2022, Plaintiffs brought this Section 1983 suit alleging that enforcement of the

8    WLAD against them violates their First Amendment rights to free exercise of religion, freedom of

9    speech, and freedom of association.  Dkt. No. 1 at 1, 13–15. Plaintiffs seek declaratory relief and

10   ask the Court to "preliminarily and permanently" enjoin the Commission from "enforcing the

11   public accommodation law and implementing regulations" against them. *Id.* at 15. They also seek

12   nominal damages. *Id.* Although Plaintiffs primarily frame their lawsuit as a pre-enforcement

13   challenge, *see* Dkt. No. 14 at 12–15, they also seek retrospective relief for allegedly compelled

14   speech. *See id.* at 27 (requesting nominal damages as redress for a "completed" constitutional

15   violation).

16       With respect to their free exercise claim, Plaintiffs allege that enforcement of the WLAD

17   "requires them to service nude males and females in the same rooms" and thus forces them to

18   "choose between violating the law or their religious convictions." Dkt. No. 1 at 14. According to

19   Plaintiffs, this constitutes "a substantial burden on their religious beliefs." *Id.* Their free association

20   claim is similarly framed in prospective terms. Plaintiffs allege that enforcement of the WLAD,

21   "which would require females in a state of nature to remain in the presence of naked males,"

22   violates their right "to selectively enter into and carry on intimate or private relationships—or

23   refrain from such relationships." *Id.* at 15. In contrast to these two claims, Plaintiffs' free speech

24   action is retrospective. They assert that the Commission required Olympus Spa to "remove

ORDER GRANTING MOTION TO DISMISS - 12

1   language from its website that has a viewpoint that 'biological women' are females and distinct

2   from males." *Id.* at 14. And because Olympus Spa "does not hold the view that transgender women

3   are female," forcing it to adopt a new, nondiscriminatory policy on its website "compels speech

4   about a moral issue [with] which Plaintiffs disagree." *Id.*

5          The Commission promptly moved to dismiss the complaint pursuant to Federal Rule of

6   Civil Procedure 12(b)(1) and (b)(6). Dkt. No. 13 at 13.[5] In the Commission's view, the Court lacks

7   subject matter jurisdiction over this action because Plaintiffs do not have standing. *Id.* It further

8   contends that, even if the Court has jurisdiction, Plaintiffs' claims fail as a matter of law. *Id.* at 13–

9   14.

10                          **II.     DISCUSSION**

11         The Court rejects the Commission's standing argument. With respect to the merits of

12   Plaintiffs' claims, however, the Court agrees that all three fail as a matter of law.

13   **A.     Rule 12(b)(1) Motion to Dismiss**

14         A motion to dismiss for lack of subject matter jurisdiction can either attack the sufficiency

15   of the pleadings on their face (a "facial attack") or present affidavits or other evidence that contest

16   the truth of the allegations in the pleadings (a "factual attack"). *Sullivan v. Ferguson*, No. 3:22-

17   CV-05403-DGE, 2022 WL 13969427, at *2 (W.D. Wash. Oct. 24, 2022) (citing *Wolfe v.*

18   *Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)). Because the Commission does not offer affidavits

19   or other evidence challenging the truth of the allegations in the complaint, the Court construes its

20   motion as a facial attack on subject matter jurisdiction. *See id.* And the Court resolves a facial

21

22   _____

23   [5] Although Director Strobert is the only named defendant in this suit, the Court attributes the motion to dismiss (and
     the arguments therein) to the Commission. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity
     suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is
24   an agent.'" (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))); *see also* Dkt. No. 13 at
     29 ("HRC respectfully asks that [the] Court dismiss Plaintiffs' Complaint, with prejudice, in its entirety.").

1  jurisdictional challenge "as it would a motion to dismiss under Rule 12(b)(6): Accepting the

2  plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the

3  court determines whether the allegations are sufficient as a legal matter to invoke the court's

4  jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). The Court presumes that a

5  case lies outside of its "limited jurisdiction" unless Plaintiffs establish otherwise. *Kokkonen v.*

6  *Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

7      1.   <u>Standing</u>

8      The Commission first contends that Plaintiffs lack standing to bring this action. Dkt. No.

9  13 at 15–22; *see Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (dismissal under Rule

10 12(b)(1) is appropriate when the plaintiff lacks standing).

11     "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions

12 and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S.

13 125, 132 (2011). "Among other things, that limitation requires a plaintiff to have standing." *Fed.*

14 *Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022). And the three elements of standing "are

15 well established: A plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged

16 conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Id.* Plaintiffs

17 bear the burden of establishing each of these elements "with the manner and degree of evidence

18 required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

19 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the

20 defendant's conduct may suffice[.]" *Id.*; *accord Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir.

21 2022); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (a plaintiff must "clearly allege"

22 facts demonstrating each standing element (cleaned up)).

23     The Court addresses whether Olympus Spa has standing to bring this suit because the

24 presence of one plaintiff with standing is sufficient to satisfy Article III's case-or-controversy

1  requirement. *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)

2  ("*FAIR*"); *accord Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012); *Sullivan*, 2022 WL

3  13969427, at *3.[6] This is so in injunctive cases, too. *Atay v. Cnty. of Maui*, 842 F.3d 688, 696 (9th

4  Cir. 2016). The Court first analyzes whether Olympus Spa has pre-enforcement standing to bring

5  its free exercise and free association claims (Counts 1 and 3), then discusses whether Olympus Spa

6  has standing to vindicate its compelled speech claim (Count 2).[7]

7         a.    Injury in Fact: Pre-Enforcement Claims

8         As for the "[f]irst and foremost" of standing's three requirements, *Steel Co.*, 523 U.S. at

9  103, the Commission contends that Plaintiffs "fail to allege that they are in any danger of sustaining

10 any injury that is both real and immediate." Dkt. No. 13 at 16. The Court disagrees.

11        To establish an injury in fact, a plaintiff must show that it suffered "an invasion of a legally

12 protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural

13 or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). Injury is particularized if it affects a plaintiff

14 "in a personal and individual way." *Id.* at 560 n.1. And it is concrete if it "actually exist[s],"

15 meaning that it is "real, and not abstract." *Spokeo*, 578 U.S. at 340 (cleaned up); *see also id.*

16 ("concrete" is not synonymous with "tangible," as "intangible injuries can nevertheless be

17 concrete"). As for the "actual or imminent" requirement, the Supreme Court has "repeatedly

18 reiterated that threatened injury must be *certainly impending* to constitute injury in fact and that

19

20 ───────────────

21 [6] The Court refers to "Plaintiffs" as a collective entity throughout this Order but analyzes their complaint and arguments in terms of whether they establish Olympus Spa's standing.

22 [7] Plaintiffs appear to suggest that the provision in the PFS agreement reserving their right to bring a constitutional challenge to the WLAD is sufficient to convey standing. *See* Dkt. No. 1 at 13 ("This lawsuit is an exercise of that right bargained for by the parties."); Dkt. No. 14 at 11 (same). As the Commission notes, however, parties cannot

23 contractually manufacture Article III standing or, by extension, federal subject matter jurisdiction. Dkt. No. 13 at 21; *see United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966–67 (9th Cir. 2004) ("It is well established that 'lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties.'" (quoting *Mitchell*

24 *v. Maurer*, 293 U.S. 237, 244 (1934))).

allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (cleaned up); *see San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (plaintiffs seeking declaratory and injunctive relief needed to show "a very significant possibility of future harm"). However, the imminence requirement is "concededly a somewhat elastic concept," *Lujan*, 504 U.S. at 564 n.2, and a plaintiff is not required "to demonstrate that it is literally certain that the harms [it] identif[ies] will come about," *Clapper*, 568 U.S. at 414 n.5. A "'substantial risk' that the harm will occur" can suffice. *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010)).

To this end, the Supreme Court has made clear that threatened enforcement of a law can create Article III injury. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000) (a plaintiff may establish standing "to challenge a law or regulation that is not presently being enforced against them"). More specifically, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Driehaus*, 573 U.S. at 164 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). A district court considers three factors when evaluating whether there is a credible threat of prosecution or enforcement: (1) "whether the plaintiff[] ha[s] articulated a 'concrete plan' to violate the law in question"; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). All three point towards a credible threat of enforcement here.

As for the first factor, "[a] concrete plan need not be 'cast in stone' but must be 'more than a hypothetical intent to violate the law.'" *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) (quoting *Thomas*, 220 F.3d at 1139). The Commission argues that Plaintiffs' complaint "fails to allege any facts to indicate they are continuing to refuse service to transgender female patrons who have not yet undergone gender transition surgery or even that they have a specific plan to begin doing so." Dkt. No. 13 at 17. But Plaintiffs do just that. In accordance with their conscience and faith, the employees aver that they "will not perform services such as massages and body scrubs on naked men," by which they mean transgender women with male genitalia. Dkt. No. 1 at 5–6; *see also* Dkt. No. 14 at 14 ("Thus, the Complaint alleges that the Spa cannot and will not let males into the . . . facility where female nudity is a requirement, because it would violate their sincerely held religious beliefs that men and women [are] not to be nude in each other's presence."). Refusal to service customers who are transgender women with male genitalia necessarily evinces an intent to violate the WLAD's proscription against discrimination based on sexual orientation, at least according to the Commission's application of the WLAD in this case. *See Harborview Fellowship v. Inslee*, 521 F. Supp. 3d 1040, 1047 (W.D. Wash. 2021) (plaintiff articulated a concrete plan to violate mask mandate by alleging that individuals conducting services do not wear masks).

The Commission stretches the "concrete plan" requirement beyond what *Driehaus* calls for: "Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." 573 U.S. at 163; *see also Yellen*, 34 F.4th at 850 (a plaintiff need not "admit to violating the law or having a desire to do so"). The Ninth Circuit has further made clear that a plaintiff need not "specify 'when, to whom, where, or under what circumstances' [it] plan[s] to violate the law when"—as here—it has "already violated the law in the past." *Tingley*, 47 F.4th at 1068 (quoting *Thomas*, 220 F.3d at 1139). The Commission's reliance on Plaintiffs' inability to pinpoint when in the future a pre-surgery

transgender woman might seek services at Olympus Spa and, in turn, be denied those services thus misses the mark. Dkt. No. 15 at 3; *see also, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1123 (9th Cir. 2009) (pharmacists challenging state rules requiring them to sell Plan B could not "control when a patient requesting Plan B w[ould] visit their pharmacy," but nonetheless had standing because they could "point to specific past instances when they h[ad] refused to sell Plan B" as "direct violations of the challenged rules").[8] The first *Thomas* factor weighs in favor of finding a credible threat of enforcement and, by extension, Article III injury.

As to the second factor, Plaintiffs do more than "cit[e] a generalized threat that [the WLAD] will be enforced"—they identify a threat of enforcement that is "particular" to Olympus Spa. *Cedar Park Assembly*, 402 F. Supp. 3d at 989. Although the Commission has not issued warnings or notices to Olympus Spa since the parties executed the PFS agreement, civil rights investigator Imiola's communications during the Wilvich investigation make clear the Commission's position on Olympus Spa's "biological women" policy, as well as its intent to enforce the law against Olympus Spa. *See Yellen*, 34 F.4th at 850 (finding second factor satisfied where there was "affirmative conduct" by the government agency "evincing an intent to enforce" the law at issue); *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (finding sufficient intent to enforce a law where state agency "sent letters to businesses notifying them" of its interpretation of a new requirement under state law); *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) ("[W]e have considered a government's preliminary efforts to enforce a speech restriction or its past enforcement of a restriction to be strong evidence . . . that pre-enforcement plaintiffs face a credible threat of adverse state action.").

---

[8] The Commission's heavy reliance on the low probability of another Wilvich complaint is also unavailing, because its ability to enforce WLAD violations does not turn on a third-party complainant. The Commission may issue a complaint on its own "[w]henever it has reason to believe that any person has engaged in or is engaging in an unfair practice[.]" Wash. Rev. Code § 49.60.230(1)(b).

ORDER GRANTING MOTION TO DISMISS - 18

1    Moreover, the PFS agreement requires Olympus Spa to bring and keep its policies in

2  compliance with the WLAD, *see* Dkt. No. 1-3 at 36, and provides the Commission with a

3  mechanism for enforcing that obligation, *see id.* at 37 (the Commission "shall determine whether

4  [Olympus Spa] has fully complied with the terms of th[e] agreement" and "shall" give written

5  notice to Olympus Spa "specifying the nature of [any] breach."). And finally, the Commission has

6  not disavowed any intent to enforce the WLAD against Olympus Spa. *See Stroh*, 205 F.3d at 1155

7  ("Courts have also considered the Government's failure to disavow application of the challenged

8  provision as a factor in favor of a finding of standing."); *accord Tingley*, 47 F.4th at 1068. Indeed,

9  as the Court's preceding discussion makes clear, the opposite is true. The second factor thus weighs

10 in favor of finding a credible threat of enforcement.

11    The third and final factor likewise supports this finding. As discussed above, the

12 Commission has not only indicated an intent to enforce the WLAD against Olympus Spa; it *has*

13 enforced the law against Olympus Spa. *See Driehaus*, 573 U.S. at 164 (finding threat of future

14 enforcement "substantial" where plaintiff organization "was the subject of a complaint in a recent

15 election cycle," and observing that "past enforcement against the same conduct is good evidence

16 that the threat of enforcement is not chimerical." (cleaned up)). Based on the three-factor *Thomas*

17 framework, the Court concludes that Plaintiffs' feared injury is "sufficiently realistic and credible

18 to confer standing under *Driehaus*[.]" *Yellen*, 34 F.4th at 851.

19         b.    Causal Connection: Pre-Enforcement Claims

20    Plaintiffs must next demonstrate "a causal connection between the injury and the conduct

21 complained of," meaning "the injury has to be fairly traceable to the challenged action of the

22 defendant, and not the result of the independent action of some third party not before the court."

23 *Lujan*, 504 U.S. at 560 (cleaned up). The Court finds that Plaintiffs have sufficiently traced

24 Olympus Spa's injury to the Commission. *See Sullivan*, 2022 WL 13969427, at *4 ("That state

1   officials are entrusted with the enforcement of state criminal laws and have the actual power to

2   enforce allegedly unconstitutional laws is sufficient to demonstrate 'the requisite causal connection

3   for standing purposes.'" (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908,

4   920 (9th Cir. 2004))).

5        The Commission nonetheless contends that Plaintiffs cannot show the requisite causal

6   connection because "[t]here is no ongoing State action against Olympus Spa or threat of imminent

7   State enforcement action against them." Dkt. No. 13 at 20. "Any alleged 'harm' to Plaintiffs," says

8   the Commission, "is being caused by Olympus Spa's decision to change its discriminatory website

9   language [and] end its discriminatory business practices" pursuant to the PFS agreement. *Id.* Both

10  arguments fail. As for the first one, it is merely a repackaging of the Commission's injury-in-fact

11  challenge, which the Court has already rejected because Olympus Spa faces a credible threat of

12  future enforcement. The first argument also overlooks the nature of pre-enforcement standing.

13  Olympus Spa seeks prospective relief from future enforcement of the WLAD. Thus, that the parties

14  settled the Wilvich complaint does not mean there is no causal connection between the threat of

15  future enforcement (the injury at issue) and the Commission.

16        Second, it is inaccurate to characterize the PFS agreement as a self-inflicted, invited, or

17  willingly incurred injury. Olympus Spa was forced to choose between self-censorship (the

18  agreement) and referral to the Attorney General for prosecution. Furthermore, the Supreme Court

19  has rejected this approach to the causation element of standing. *See Cruz*, 142 S. Ct. at 1647 ("[W]e

20  have made clear that an injury resulting from the application or threatened application of an

21  unlawful enactment remains fairly traceable to such application, even if the injury could be

22  described in some sense as willingly incurred."). The Commission attempts to sidestep this

23  straightforward result by pointing to *Clapper*, an inapposite case in which the Supreme Court held

24  that the plaintiffs could not "manufacture standing merely by inflicting harm on themselves based

1    on their fears of *hypothetical future harm that is not certainly impending*." 568 U.S. at 416

2    (emphasis added); *see* Dkt. No. 15 at 5. eAs discussed above, Olympus Spa faces a threat of

3    enforcement sufficiently credible to establish Article III injury.

4                    c.    Redressability: Pre-Enforcement Claims

5           "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be

6    'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare*

7    *Rights Org.*, 426 U.S. 26, 38 (1976)). Plaintiffs are not required to guarantee that Olympus Spa's

8    injuries will be redressed by a favorable decision. *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir.

9    2012). Rather, they "need only show that there would be a 'change in a legal status,' and that a

10   'practical consequence of that change would amount to a significant increase in the likelihood that

11   [they] would obtain relief that directly redresses the injury suffered.'" *Id.* (quoting *Utah v. Evans*,

12   536 U.S. 452, 464 (2002)). Plaintiffs' burden under this element is "relatively modest." *Bennett v.*

13   *Spear*, 520 U.S. 154, 171 (1997).

14          The Commission contests this element. In its eyes, Plaintiffs "plainly fail to demonstrate

15   redressability" because "there is nothing to enjoin." Dkt. No. 15 at 6. The Commission again points

16   to the PFS agreement and claims that it extinguished any case or controversy. *See* Dkt. No. 13 at

17   21 ("[T]his Court cannot provide any relief to Plaintiffs because the settlement agreement ended

18   [the Commission's] investigation of Olympus Spa[.]"). The Court has determined that Olympus

19   Spa faces a credible threat of future enforcement, and the settlement of the Wilvich complaint does

20   not speak to that injury. The relief Plaintiffs request would redress the injury at issue because it

21   would declare application of the WLAD to Olympus Spa's "biological women" policy

22   unconstitutional. And an order enjoining future enforcement would obviously preclude the

23   Commission from penalizing that policy. The third standing element is met.

24                   d.    Standing to Bring "Completed" Free Speech Violation

The Court further finds that Olympus Spa has standing to vindicate its allegedly compelled speech. As an initial matter, "the inquiry tilts dramatically toward a finding of standing" whenever First Amendment speech is implicated. *Stroh*, 205 F.3d at 1155; *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("Particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements."). Plaintiffs have sufficiently alleged that Olympus Spa sustained an "actual" and "concrete" injury: self-censorship. *See Getman*, 328 F.3d at 1095 (plaintiff "suffered the constitutionally recognized injury of self-censorship."); *Tingley*, 47 F.4th at 1067 (a chilling of the exercise of First Amendment rights is itself a constitutionally sufficient injury). Olympus Spa removed the "biological women" policy from its website in direct response to the Commission's investigation and under threat of penalties. Indeed, removal of that language was a term of the PFS agreement. And the agreement suspends legal consequences for Olympus Spa only so long as it complies with the terms, i.e., so long as it continues to self-censor. *See Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006–1007 (9th Cir. 2003) (organization "was forced to modify its speech and behavior to comply with the statute"; it did not lack standing "merely because [it] chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action."). Contrary to the Commission's suggestion, then, the PFS agreement does not nullify the alleged constitutional injury. *See* Dkt. No. 13 at 18 ("Any justiciable case or controversy between [the Commission] and Olympus Spa ended with the execution of the settlement agreement[.]"). Nor does it matter that the Commission "stopped its investigation of Olympus Spa," made "[n]o formal finding of discrimination," and closed the Wilvich complaint. *Id.*

The remaining two standing elements are likewise satisfied. As already discussed, the complained-of injury is traceable to the Commission because it is the state agency responsible for

1   enforcing the WLAD. *See Sullivan*, 2022 WL 13969427, at *4. And that Olympus Spa elected to

2   self-censor rather than be referred to the Attorney General for prosecution does not defeat the

3   causal connection. *See Cruz*, 142 S. Ct. at 1647. Plaintiffs have likewise established that nominal

4   damages will redress Olympus Spa's allegedly compelled speech. *See Uzuegbunam v. Preczewski*,

5   141 S. Ct. 792, 802 (2021) ("[A] request for nominal damages satisfies the redressability element

6   of standing where a plaintiff's claim is based on a completed violation of a legal right."). Olympus

7   Spa therefore has standing to assert its free speech claim.

8       2.   Ripeness

9       The Commission also urges the Court to dismiss Plaintiffs' complaint because their claims

10  are not ripe for judicial review. It argues that prospective relief is inappropriate here because

11  Plaintiffs' claims "rest on contingent future events that may never happen." Dkt. No. 13 at 22; *see*

12  *also* Dkt. No. 15 at 6 ("Plaintiffs['] claims are not ripe for the same reasons they cannot establish

13  standing[.]").

14      "Along with standing and mootness, ripeness is one of three justiciability requirements."

15  *Twitter, Inc. v. Paxton*, 26 F.4th 1119, 1122 (9th Cir. 2022). "The basic rationale of the ripeness

16  requirement is to prevent the courts, through avoidance of premature adjudication, from entangling

17  themselves in abstract disagreements." *Id.* at 1123 (cleaned up). The doctrine "is drawn both from

18  Article III limitations on judicial power and from prudential reasons for refusing to exercise

19  jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "Thus, in conducting a

20  traditional ripeness inquiry, we evaluate both 'a constitutional and a prudential component.'" *Clark*

21  *v. City of Seattle*, 899 F.3d 802, 809 (9th Cir. 2018) (quoting *Bishop Paiute Tribe v. Inyo Cnty.*,

22  863 F.3d 1144, 1153 (9th Cir. 2017)). However, the constitutional component "overlaps with the

23  'injury in fact' analysis for Article III standing." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th

24  Cir. 2010); *see also Thomas*, 220 F.3d at 1138. To the extent, then, that the Commission targets

1   the constitutional component of ripeness by suggesting that Olympus Spa has not suffered an

2   injury, the Court rejects that argument for the reasons set forth *supra*.

3        The prudential component warrants some discussion. Under this portion of the ripeness

4   doctrine, the Court must evaluate (1) the fitness of the issues for judicial decision and (2) the

5   hardship to the parties of withholding judicial consideration. *Paxton*, 26 F.4th at 1123. "A claim

6   is fit for decision if the issues raised are primarily legal, do not require further factual development,

7   and the challenged action is final." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health*

8   *Care*, 968 F.3d 738, 752 (9th Cir. 2020) (cleaned up). Also relevant to the fitness prong is "whether

9   the action has a direct and immediate effect on the complaining parties; whether the action has the

10  status of law; and whether the action requires immediate compliance with its terms." *Tingley*, 47

11  F.4th at 1070 (cleaned up). As for the hardship prong, the Court considers whether the action

12  "requires an immediate and significant change in plaintiffs' conduct of their affairs with serious

13  penalties attached to noncompliance." *Id.* at 1070–71 (cleaned up).

14       The fitness prong is satisfied here. The Court acknowledges that the record is somewhat

15  "thin and sketchy." *Thomas*, 220 F.3d at 1141 (record consisted of "a few conclusory affidavits").

16  And as the Ninth Circuit has recognized, "bringing a First Amendment challenge to a law does not

17  necessarily mean that the issues presented are 'purely legal.'" *Tingley* 47 F.4th at 1070 (quoting

18  *Thomas*, 220 F.3d at 1142). But as was the case in *Tingley*, the law at issue here—the WLAD—

19  "is final," "represents Washington's final decision with respect to prohibiting [discrimination

20  based on sexual orientation]," and is "binding" on Olympus Spa, which "must immediately comply

21  with its terms." *Id.* And, unlike *Thomas*, where there were no aggrieved tenants, there was no

22  history of enforcement, and the record was devoid of any factual context, here the Commission's

23  enforcement of the WLAD against Olympus Spa provides the Court with the requisite "concrete

24  factual scenario that demonstrates how the [WLAD], as applied, infringe[s] [Plaintiffs']

ORDER GRANTING MOTION TO DISMISS - 24

constitutional rights." *Thomas*, 220 F.3d at 1141; *see Paxton*, 26 F.4th at 1124 (issues were not fit for judicial decision because attorney general had not yet made an allegation against plaintiff, the facts were not yet developed, and the plaintiff did not need to comply with the civil investigative demand). Olympus Spa has also delineated the bounds of its "biological women" policy and clarified to whom it applies. *See Thomas*, 220 F.3d at 1142 n.8 (scope of landlords' religiously driven tenant selection criteria was unclear). Thus, the record "is admittedly sparse," but "there are no incomplete hypotheticals or open factual questions akin to those in *Thomas*[.]" *Stormans*, 586 F.3d at 1126.

This case is materially identical to *Stormans*. Although the plaintiffs there could not foretell when patients might enter their pharmacies and request Plan B, whenever that did happen, the plaintiffs would refuse to sell the drug. *See* 586 F.3d at 1126 ("If a patient enters their pharmacies requesting Plan B, which the record reflects has occurred, [plaintiffs] will refuse to deliver the medication."). Here, too, Plaintiffs will refuse service to pre-surgery transgender women if they enter an Olympus Spa facility. And the complaint indicates that Plaintiffs have refused service to patrons with male genitalia on several occasions (including the January 2020 Wilvich incident). That Olympus Spa cannot tell the future with respect to prospective clientele does not render this dispute unfit for judicial review. *See 303 Creative*, 6 F.4th at 1176 (although "the record would be better developed, and the legal issues would be clearer, if Appellants had denied services to a customer, that customer filed a complaint, and that complaint was adjudicated through the appropriate administrative and judicial channels," Article III does not require that).

The hardship prong is likewise met in this case. The WLAD and the Commission's application of that law to Olympus Spa "requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Tingley*, 47 F.4th at 1070–71 (cleaned up). Olympus Spa has had to self-censor and forego its "biological women"

1   policy under both the PFS agreement and threat of future enforcement. If it breaches the terms of

2   that agreement or otherwise violates the WLAD, it faces civil penalties. *See id.* at 1071 (application

3   of law to plaintiff required an immediate and significant change in his conduct because he was

4   forced to choose between refraining from desired speech and engaging in speech that risked costly

5   sanctions). In *Thomas*, the Ninth Circuit stated that hardship analysis "dovetails, in part, with the

6   constitutional consideration of injury." 220 F.3d at 1142. And there "the absence of any real or

7   imminent threat of enforcement . . . seriously undermine[d] any claim of hardship." *Id.* The court

8   was careful to emphasize several circumstances in that case: there were no "particular victims of

9   discrimination," neither of the plaintiff landlords had been charged with violating the statutes at

10   issue, and, again, there was no reasonable or imminent threat of enforcement. *Id.* The opposite is

11   true in this case. Olympus Spa faces a credible threat of future enforcement, the Commission has

12   already enforced the WLAD against Olympus Spa for its "biological women" policy, and there is

13   at least one "particular" alleged victim of that policy.

14        Finally, the Court considers the hardship to the government from moving forward with this

15   case. *Paxton*, 26 F.4th at 1123. Even if Olympus Spa will suffer hardship from withholding judicial

16   consideration, "that hardship may still be insufficient to overcome the uncertainty of the legal issue

17   presented in the case in its current posture and thus fail to outweigh . . . the government's interest

18   in delaying review." *Id.* (cleaned up). Here, however, the Commission fails to persuade the Court

19   that judicial review will pose a hardship sufficient to justify prudential restraint. Indeed, and as

20   already discussed, further factual development is unnecessary to resolve the legal issue presented:

21   application of the WLAD to Olympus Spa's "biological women" policy. The Commission passed

22   on that issue and there is no reason to delay review until the next complaint is issued.

23

24

**B.      Rule 12(b)(6) Motion to Dismiss**

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true all factual allegations in the complaint and construes them in the light most favorable to the nonmoving party. *Gonzalez v. Google LLC*, 2 F.4th 871, 885 (9th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) (a plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief"). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

1.      Free Exercise Claim (Count 1)

As for their first claim, Plaintiffs observe that they "have the liberty to not only believe as they do about males and females in a state of undress, but they also have the right to freely *exercise* their religious rights, i.e., to act in accordance with their faith-based convictions." Dkt. No. 1 at 13. Plaintiffs allege that the Commission's enforcement of the WLAD against them, "which requires them to service nude males and females in the same rooms," forces them "to choose between violating the law or their religious convictions." *Id.* at 14. This, according to Plaintiffs, imposes a substantial burden on the exercise of their religious beliefs. *Id.* The Commission counters that the WLAD is a neutral law of general applicability and therefore does not run afoul of the First Amendment. *See* Dkt. No. 13 at 23–26. The Court agrees with the Commission and dismisses this claim.

The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, states that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. This constitutional provision "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). However, it does not exempt Olympus Spa from the WLAD. *See Masterpiece Cakeshop*, 138 S. Ct. at 1727. The Supreme Court recently left intact *Smith*'s holding that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021); *see Smith*, 494 U.S. at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.").

Plaintiffs fail to plead—let alone plausibly—that the WLAD is anything but neutral. The law does not discriminate on its face, and it does not by its terms favor a particular religion or the non-exercise of religion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face."). Nor have Plaintiffs alleged facts to suggest that the legislature was motivated by a masked intent to discourage religious exercise or discriminate against their religion. *See id.* at 534, 540 (governmental hostility can be "masked, as well as overt," and the court may look to "the events leading to the enactment . . . in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."). Plaintiffs have also not alleged that the Commission's application of the WLAD in this case was motivated by any "clear and

impermissible hostility toward the sincere religious beliefs that motivated [their] objection," and the Court is unable to discern any facts in the record that would support such a claim. *Cf. Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1729.

Because the WLAD is neutral and generally applicable, the Court applies rational basis review, meaning the law need only be rationally related to a legitimate governmental purpose to survive constitutional scrutiny. *See Stormans*, 586 F.3d at 1137.[9] "Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018). Plaintiffs thus bear the burden of negating "every conceivable basis which might support" the WLAD. *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (internal citation and quotation omitted). This they cannot do.

The Court finds that the WLAD survives the "two-tiered inquiry" of rational basis review. *Gascon*, 880 F.3d at 457. First, the WLAD has a legitimate purpose: "It is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights." Wash. Rev. Code § 49.60.010. Courts routinely find such purposes "compelling." *See, e.g., Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (Minnesota public accommodation law's goals of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order."); *303 Creative*, 6 F.4th at 1178 ("Colorado has a compelling interest in protecting both the dignity interests of members of marginalized groups and their material interests in accessing the commercial

---

[9] Plaintiffs repeatedly argue that the WLAD substantially burdens their religion and is not narrowly tailored to achieve the state's anti-discriminatory goals. *See* Dkt. No. 14 at 23–25. But the "narrowly tailored" requirement is a facet of strict scrutiny—the "most rigorous" level of constitutional review that does not apply here. *See Lukumi Babalu Aye*, 508 U.S. at 546.

marketplace."). And second, the WLAD promotes its purported purpose. The State "carries a light burden" with respect to the second tier of the test, *Gascon*, 880 F.3d at 457, because "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data," *Beach Commc'ns*, 508 U.S. at 315. It is axiomatic that the WLAD—which proscribes discrimination in places of public accommodation—advances Washington's "legitimate interest in ensuring equal access to public accommodation." *Arlene's Flowers*, 441 P.3d at 1231. Plaintiffs' free exercise claim therefore fails.

Plaintiffs attempt to raise a "hybrid rights" claim. In *Smith*, the Supreme Court excepted from rational basis review "hybrid situation[s]"—those cases that involve "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press[.]" 494 U.S. at 881–82. Plaintiffs accordingly wish to tether their free exercise claim to "either or both" of their remaining claims in the hopes that the Court will apply strict scrutiny to the WLAD. *See* Dkt. No. 14 at 25; *see San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) ("If . . . a law burdens the free exercise of religion *and* some other constitutionally-protected activity, there is a First Amendment violation unless the strict scrutiny test is satisfied[.]"). But a hybrid rights claim requires more than a bald allegation that a companion right is implicated or has been violated. "[T]o assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated—that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (cleaned up). Put differently, a hybrid rights claim is not entitled to strict scrutiny analysis merely because it "combine[s] a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right[.]" *Id.* at 1208. For the reasons discussed below, Plaintiffs fail to allege a plausible free speech or free association

1   violation. Neither of those claims, then, combines with their free exercise claim to create a viable

2   hybrid rights claim. The Court dismisses Plaintiffs' free exercise claim.

3       2.      Free Speech Claim (Count 2)

4       Plaintiffs contend that the Commission required Olympus Spa to "remove language from

5   its website that has a viewpoint that 'biological women' are females and distinct from males." Dkt.

6   No. 1 at 14. More specifically, the Commission "forced Olympus Spa to 'adopt new language on

7   its website reflecting a nondiscriminatory policy' that affirms equal access, service, and treatment

8   for all customers 'without regard to . . . sexual orientation or gender identity.'" *Id.* (quoting Dkt.

9   No. 1-3 at 36).[10] And because Olympus Spa "does not hold the view that transgender women are

10  female," the new website language "compels speech about a moral issue [with] which the Plaintiffs

11  disagree." *Id.*; *see* Dkt. No. 14 at 19 ("By requiring the Spa. . . to erase its message on the website

12  and change it to a government approved message, the State has abridged the speech rights of the

13  Spa.").[11]

14      The Commission defends its actions on two fronts. First, it argues that Olympus Spa's

15  alteration of the website language cannot form the basis of a free speech challenge because the

16  alteration was a voluntary change pursuant to the PFS agreement. Dkt. No. 13 at 26. This is yet

17  another variation of the already rejected "invited injury" argument. That Olympus Spa agreed to

18  several terms (including self-censorship) to avoid formal prosecution is exactly the point, and the

19  Court need not rehash this issue any further. The Commission's second argument is the winning

20  one. As it notes, the WLAD "does not control speech; it simply requires Plaintiffs, who have freely

21

22  ―――――――――――
    [10] Plaintiffs' excerpt of the PFS agreement contains two errors. The agreement memorialized the fact that Olympus
    Spa had "adopted" new website language reflective of a "non-discriminatory" policy. Dkt. No. 1-3 at 36.

23  [11] The Court was unable to identify the so-called "government approved" message anywhere in the record. Plaintiffs
    appear to have attached the original "biological women" policy to their Complaint, *see* Dkt. No. 1-3 at 13; presumably

24  the "government approved" message simply refers to the deletion of that policy from the Spa's website.

chosen to offer their services to the public, to refrain from turning customers away because they fall into a protected class." Dkt. No. 15 at 9–10.

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const. amend. I. Under the Free Speech Clause, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws that compel individuals to speak a particular message are content-based. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *see also Hurley,* 515 U.S. at 573 ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say[.]'" (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986))).

The law at issue here, however, is not a content-based speech restriction. The Commission correctly observes that the WLAD does not target speech—indeed, it says nothing at all about speech and does not purport to outlaw a particular idea, topic, message, or viewpoint. *See Reed*, 576 U.S. at 163 (a law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed"; the court considers whether the challenged "regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011))). The WLAD instead regulates discriminatory conduct.[12] It "imposes a flat ban" on discrimination in places of public

---

[12] Expressive conduct can of course be protected "speech" within the meaning of the First Amendment. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word."). However, the conduct regulated by the WLAD—discriminatory exclusion of protected persons from places of public accommodation—is not the kind

accommodation—"one that is applied without regard to [the] content" of a business's message. *One World One Fam. Now v. City and Cnty. of Honolulu*, 76 F.3d 1009, 1012 (9th Cir. 1996). And as the Supreme Court has repeatedly observed, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The compelled speech to which Olympus Spa points is "plainly incidental" to the WLAD's regulation of discriminatory conduct. *FAIR*, 547 U.S. at 62. The WLAD bars Olympus Spa from denying services to customers based on sexual orientation and, in this regard, it incidentally burdens Olympus Spa's speech by prohibiting advertisement of discriminatory entrance policies (e.g., one that permits only "biological women"). But that does not convert the WLAD into a content-based regulation. To borrow an analogous example from the Supreme Court, "Congress . . . can prohibit employers from discriminating in hiring on the basis of race," and "that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Id.*; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct[.]"); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); *303 Creative*, 6 F.4th at 1183 (proposed statement on website, which expressed an intent to deny service based on sexual orientation, was not protected by the First Amendment).

---

of "inherently expressive" conduct to which First Amendment protection extends. *See FAIR*, 547 U.S. at 65–66; *Jaycees*, 468 U.S. at 628 ("[L]ike violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, [discriminatory] practices are entitled to no constitutional protection."). Nor does the WLAD "proscribe particular conduct *because* it has expressive elements." *Johnson*, 491 U.S. at 406.

This is critical for purposes of constitutional review because a facially neutral regulation that incidentally burdens speech receives intermediate scrutiny. Such a law does not violate the First Amendment "if it 'furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *United States v. Albertini*, 472 U.S. 675, 687–88 (1985) (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). The WLAD meets all three of these requirements. First, the WLAD promotes an important—indeed, a "compelling"—state interest. *See, e.g.*, *Jaycees*, 468 U.S. at 628 ("[A]cts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent[.]"). Second, this compelling interest in protecting the public's civil rights has nothing to do with suppressing free expression. And third, the WLAD's incidental restriction on speech is no greater than is essential to the furtherance of that interest.

The final *O'Brien* requirement is met where, as here, the government's interest "would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689. Why that is so needs little elaboration. The public's civil rights—and more specifically, equal access to public accommodation—would be in dire jeopardy if businesses such as Olympus Spa could discriminate and refuse services to individuals on account of "race, creed, color, national origin, citizenship or immigration status, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability[.]" Wash. Rev. Code § 49.60.030(1). To be sure, there may be other adequate means the legislature could use to accomplish this goal. But that is not the test. Under *O'Brien*, the WLAD need only "add to the effectiveness" of the government's efforts to safeguard civil rights and ensure equal access to public accommodation. *See FAIR*, 547 U.S. at 67 (the issue was not whether "other means of raising an army and providing for a navy

might be adequate"; it sufficed that Congress's chosen means "add[ed] to the effectiveness of military recruitment"); *Albertini*, 472 U.S. at 689 ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests."). The WLAD is a content-neutral regulation that does not run afoul of the Free Speech Clause. And the allegedly compelled speech Plaintiffs take issue with is incidental to the WLAD's regulation of discriminatory conduct. Plaintiffs' free speech claim is dismissed.[13]

3.     Free Association Claim (Count 3)

In their final claim, Plaintiffs allege that enforcement of the WLAD against them "would require females . . . to remain in the presence of naked males" and therefore violates their "freedom protected by the Bill of Rights to selectively enter into and carry on intimate or private relationships—or refrain from such relationships." Dkt. No. 1 at 15; *see* Dkt. No. 14 at 21–22 ("To be exposed to the shocking and jarring visual of a penis while naked and to be viewed by someone who could become turgid due to viewing the female form would be an extreme offense and violative of the right to feel secure in one's person and association."). The Commission disagrees. It contends that "the First Amendment does not protect the association between and among [Olympus Spa's] owners, staff, and customers." Dkt. No. 13 at 28. Moreover, "Plaintiffs allege no facts indicating that such relationships bear the characteristics of personal associations protected by the First Amendment." *Id.*

---

[13] To the extent Plaintiffs seek nominal damages to redress their allegedly compelled speech, the Court agrees with the Commission that such damages are unavailable here. *See* Dkt. No. 13 at 14. It is well-settled law that state officials cannot be sued in their official capacities for damages under Section 1983. They may be sued for damages only in their individual capacities. *See Arizonans for Off. English v. Arizona*, 520 U.S. 43, 69 n.24 (1997). Plaintiffs, however, are suing Director Armstrong in her official capacity only. *See* Dkt. No. 1 at 1.

1      The Supreme Court distinguishes between two constitutionally protected freedoms of

2  association: the "freedom of intimate association"[14] and the "freedom of expressive association."

3  *Jaycees*, 468 U.S. at 617–18. The former involves the right "to enter into and maintain certain

4  intimate human relationships"—relationships which "must be secured against undue intrusion by

5  the State because of the role of such relationships in safeguarding the individual freedom that is

6  central to our constitutional scheme." *Id.* at 617–18. The freedom of intimate association "receives

7  protection as a fundamental element of personal liberty." *Id.* at 618. On the other hand, the freedom

8  of expressive association refers to the "right to associate for the purpose of engaging in those

9  activities protected by the First Amendment—speech, assembly, petition for the redress of

10  grievances, and the exercise of religion." *Id.* It is viewed "as an indispensable means of preserving

11  other individual liberties." *Id.*

12      Plaintiffs raise an intimate association claim. Although the "precise boundaries of this type

13  of constitutional protection" remain unmarked, the intimate relationships that have qualified for

14  the protection include "marriage; the begetting and bearing of children; child rearing and

15  education; and cohabitation with relatives." *Rotary Club of Duarte*, 481 U.S. at 545 (internal

16  citations omitted). This is not to suggest that intimate association is restricted to family matters.

17  *Id.* Rather, qualifying relationships "are distinguished by such attributes as relative smallness, a

18  high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from

19  others in critical aspects of the relationship." *Jaycees*, 468 U.S. at 620; *Rotary Club of Duarte*, 481

20  U.S. at 546 ("In determining whether a particular association is sufficiently personal or private to

21  warrant constitutional protection, we consider factors such as size, purpose, selectivity, and

22  whether others are excluded from critical aspects of the relationship."). The Court must conduct a

23

24  [14] The Supreme Court has also referred to this as the "freedom of private association." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 547 (1987).

ORDER GRANTING MOTION TO DISMISS - 36

"careful assessment" of the relationship's characteristics to locate where it falls on a spectrum "from the most intimate to the most attenuated of personal attachments." *Jaycees*, 468 U.S. at 620; *see, e.g.*, *Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 1221 (9th Cir. 2012) (finding that roommate relationship "easily qualifies" for protection because people "generally have very few roommates; they are selective in choosing roommates; and non-roommates are excluded from the critical aspects of the relationship[.]").

The relationship between Olympus Spa and its customers clearly falls "outside of the category of relationships worthy of this kind of constitutional protection." *Jaycees*, 468 U.S. at 620. It is a business—not a private club with an exclusive membership. As such, Olympus Spa is open to the public and provides services to countless (female) strangers on a daily basis. The Supreme Court has for these reasons observed that "a large business enterprise" is the type of association that "seems remote from the concerns giving rise to th[e] constitutional protection." *Id.* Although Olympus Spa may not constitute a *large* enterprise, the analogy is still apposite: spa-goers "are not members of any organized association; they are patrons of the same business establishment. Most are strangers to one another, and the [spa] admits all [biological females] who are willing to pay[.]" *City of Dallas v. Stanglin*, 490 U.S. 19, 24–25 (1989) (activity of dancehall patrons did not qualify as a form of intimate association).

Plaintiffs emphasize Olympus Spa's female-only exclusivity and female-oriented purpose. Dkt. No. 14 at 20. They likewise suggest that the business is sufficiently personal and private to warrant constitutional protection because "the state of being unclothed requires the most intimate of settings[.]" *Id.* at 21. But this again elides a basic, controlling fact: Olympus Spa is a business that provides services to the public. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 12 (1988) ("It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public

accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity to practice discrimination when the government has barred it from doing so."). And as was the case in *Jaycees*, Olympus Spa does not—"[a]part from . . . sex"—employ any criteria for judging patrons, who are routinely "admitted with no inquiry into their backgrounds." 468 U.S. at 621. Indeed, "much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship." *Id.*; *Rotary Club of Duarte*, 481 U.S. at 547 (many of organization's "central activities" were "carried on in the presence of strangers").

The Court does not minimize the privacy concerns at play when employees are performing exfoliating massages on nude patrons. Aside from this nudity, though, there is simply nothing private about the relationship between Olympus Spa, its employees, and the random strangers who walk in the door seeking a massage. Nor is there anything selective about the association at issue beyond Olympus Spa's "biological women" policy. The Court therefore has little difficulty concluding that the personal attachments implicated here are too attenuated to qualify for constitutional protection. Plaintiffs' intimate association claim is dismissed.

The Court therefore grants the Commission's motion to dismiss.

4.    Leave to Amend

Plaintiffs ask for leave to amend their complaint "to add defendants in their individual capacities" should the Court find that nominal damages are unavailable. Dkt. No. 14 at 27. The Commission objects to this request. It argues that any such amendment would be futile "because the individual defendants would be entitled to qualified immunity[.]" Dkt. No. 15 at 13. Given the extremely lenient standard governing Rule 15(a)(2), the Court permits Plaintiffs an opportunity to

amend their complaint.[15]

"A party may amend its pleading with the court's leave, which '[t]he court should freely give . . . when justice so requires.'" *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (alteration in original) (quoting Fed. R. Civ. P. 15(a)(2)). As the language of the rule suggests, the standard for leave to amend is "very liberal." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) ("[T]his policy is to be applied with extreme liberality."). The Court considers five factors when determining whether to grant leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether the party has previously amended the complaint. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). "The party opposing amendment bears the burden of showing why leave to amend should not be granted." *Hedglin v. Swift Transp. Co. of Ariz.*, No. C16-5127-BHS, 2016 WL 8738685, at *1 (W.D. Wash. Nov. 15, 2016).

Leave to amend is appropriate here. As for the first three factors—bad faith, undue delay, and prejudice to the opposing party—the Court discerns nothing in the record sufficient to overcome Rule 15(a)'s presumption in favor of leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam) (prejudice to the opposing party "carries the greatest weight" and, absent prejudice or a "strong showing" under the other factors, there is a presumption in favor of granting leave to amend). The Commission does not argue (and thus has not shown) that Plaintiffs intend to amend their complaint in bad faith or that permitting an amended complaint will result in undue delay. This case is also still in its earliest stages. The

---

[15] Although Plaintiffs limit their request to the addition of defendants in their individual capacities, the Court addresses the propriety of leave to amend the complaint generally (i.e., in other respects) because such leave should be granted "even if no request . . . was made[.]" *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

Court has not yet set a schedule, and there are therefore no impending deadlines or trial date. The Court even vacated the initial scheduling deadlines pending resolution of the Commission motion to dismiss. June 23, 2022 Docket Entry; *see DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187–88 (9th Cir. 1987) (granting leave to amend did not prejudice opposing party because the case was "still at the discovery stage with no trial date pending").

The fourth and fifth factors likewise favor leave to amend. The Ninth Circuit has repeatedly emphasized that "[a] district court abuses its discretion by denying leave to amend unless amendment would be futile or the plaintiff has failed to cure the complaint's deficiencies despite repeated opportunities." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012); *accord Heineke v. Santa Clara Univ.*, 812 F. App'x 644, 645 (9th Cir. 2020). The Court cannot say that amendment is futile here.

The Court therefore grants Plaintiffs leave to amend their Complaint, without restricting that leave to the specific grounds Plaintiffs have requested. Plaintiffs may file an amended complaint adding new facts and claims, and may do so within 30 days of the date of this order. Failure to do so will result in dismissal of the Complaint with prejudice.

### III.   CONCLUSION

For the reasons stated above, the Court GRANTS the Commission's Motion to Dismiss, without prejudice. Dkt. No. 13. Plaintiffs may file an amended complaint within 30 days of the date of this Order.

Dated:  June 5th, 2023.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge