```
1              UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

   _____
3                              )
   OLYMPUS SPA, et al.,        )
4                              )
                   Plaintiffs, ) C22-00340-BJR
5                              )
   v.                          ) Tacoma, Washington
6                              )
   ANDRETA ARMSTRONG, in her   ) June 2, 2023
7  official capacity as        ) 8:00 a.m.
   Executive Director of the   )
8  Washington State Human      ) Motion to Dismiss
   Rights Commission, et al.,  ) (via Zoom)
9                              )
                   Defendant.  )
10                             )
   _____
11
               VERBATIM REPORT OF PROCEEDINGS
12      BEFORE THE HONORABLE BARBARA J. ROTHSTEIN
               UNITED STATES DISTRICT JUDGE
13 _____

14
   APPEARANCES:
15

16  For the Plaintiffs      TRACY TRIBBETT
                            Pacific Justice Institute
17                          6404 Three Rivers Dr.
                            Pasco, WA 99301
18

19  For the Defendant:      NEAL HAROLD LUNA
                            Attorney General's Office
20                          800 5th Ave., Suite 2000
                            Seattle, WA 98104
21

22

23

24
        Proceedings stenographically reported and transcript
25            produced with computer-aided technology
```

1          JUNE 2, 2023 - MORNING SESSION

2                *   *   *   *   *   *

3          THE DEPUTY CLERK:  The United States District Court

4    for the Western District of Washington is now in session, the

5    Honorable Judge Barbara J. Rothstein presiding.

6       We are here in the matter of Olympus Spa, et al. versus

7    Sharon Ortiz, Cause Number 22-cv-340, assigned to this Court.

8       Counsel, please make your appearances for the record.

9    Let's start with the plaintiff.

10          MS. TRIBBETT:  Tracy Tribbett of the Pacific Justice

11   Institute appearing on behalf of plaintiffs.

12          MR. LUNA:  Your Honor, I am Neal Luna.  I'm appearing

13   on behalf of the Human Rights Commission.

14       I'd just like to note that Sharon Ortiz is no longer the

15   director of the Human Rights Commission.  Andreta Armstrong

16   is, and so she automatically would replace Ms. Ortiz in the

17   pleadings.

18          THE COURT:  Okay.  Thank you.  Are we ready to

19   proceed?

20          MR. LUNA:  Yes, Your Honor.

21          MS. TRIBBETT:  Yes, Your Honor.

22          THE COURT:  Mr. Luna, I believe this is your motion,

23   right?

24          MR. LUNA:  It is.

25          THE COURT:  I think you lead off, if you would,

1   please.

2          MR. LUNA:  Thank you, Your Honor, and thank you for

3   giving this motion a hearing.  May it please the Court.

4      Your Honor, there was never any case or controversy

5   involving the individual plaintiffs, and the mutual

6   consideration exchanged between the Human Rights Commission

7   and Olympus Spa ended any judiciable case or controversy as

8   to Olympus Spa.  This Court should grant HRC's motion to

9   dismiss, with prejudice, plaintiffs' Complaint in its

10  entirety to deny plaintiffs another bite at the apple in the

11  forum of its choosing.

12      I will address the standing issues first and then show how

13  U.S. Supreme Court precedent bars plaintiffs' claims on their

14  merits, even if plaintiffs had standing.

15      I'd like to reserve five minutes for rebuttal.

16          THE COURT:  Okay.

17          MR. LUNA:  Turning to the standing issues first, Your

18  Honor, HRC first moves this Court to dismiss plaintiffs'

19  Complaint under Rule 12(b)(1) for lack of subject-matter

20  jurisdiction.

21      Article III of the U.S. Constitution permits federal

22  courts to hear only live cases or controversies, and there is

23  none here.  Federal courts -- it's black-letter law, Your

24  Honor, that federal courts do not issue advisory opinions,

25  and it is plaintiffs' burden to show at every stage of the

1    proceeding that it had -- it suffered actual or imminent harm

2    that was caused by HRC and that this Court can make a remedy

3    that can redress their alleged harm.  That would -- those are

4    the standing elements, Your Honor.  And this Court,

5    importantly, need not accept -- at this stage, it need not

6    accept plaintiffs' alleged facts as true.

7         Now, as to the individual plaintiffs, they were never

8    harmed nor were they ever threatened with enforcement, even

9    under the facts alleged in the Complaint.  So their fear of

10   enforcement is not only not supported by the facts alleged in

11   the Complaint, but it is also -- they are also insufficient

12   to support standing here.

13        Now, turning to Olympus Spa, Olympus Spa settled the case

14   or controversy that forms the basis of its Complaint here.

15   They adopted -- as part of that settlement, they adopted

16   nondiscriminatory policies and promised not to discriminate

17   based on gender going forward.  In exchange, HRC, and even

18   Ms. Wilvich, dropped any further enforcement against Olympus

19   Spa.  A constitutional challenge to the WLAD, the Washington

20   Law Against Discrimination, based on hypothetical facts,

21   cannot support Article III standing.

22        Now, as to the reservation of rights clause that's in the

23   settlement agreement, Your Honor, again, it's black-letter

24   law that parties do not agree to confer subject-matter

25   jurisdiction on the federal court.  Olympus Spa cannot show

1 | actual or imminent harm here.  The facts alleged in the
2 | Complaint actually show that future incidents are unlikely
3 | and even less likely to occur than they were before, so
4 | Olympus Spa -- the changes that Olympus Spa has made make it
5 | less -- make enforcement less likely.
6 |     Also, the Complaint alleges only one instance of a
7 | transgender woman, who has not had gender-affirming surgery,
8 | who had attempted to access the spa's services in over
9 | 20 years of the spa's existence.  So the harm here is not
10 | imminent or concrete enough to support standing.
11 |     Now, can the harm be traceable to HRC's conduct?  And the
12 | answer is "no."  Olympus Spa, again, settled this case, Your
13 | Honor.  So this case is more like the *Clapper* case that HRC
14 | cites in its briefing than the *Cruz* case that the plaintiffs
15 | cite in their briefing.
16 |     In *Clapper*, Your Honor, the plaintiffs there lack
17 | standing, because they had incurred certain costs to avoid
18 | the application of the statute; whereas, in *Cruz*, Ted --
19 | Senator Cruz actually loaned his campaign $10,000 more than
20 | what was allowed.  So he was -- his alleged self-inflicted
21 | harm was meant to trigger application of the statute.  He put
22 | himself there in harm's way to trigger application of the
23 | statute; whereas, the statute no longer applied to the
24 | plaintiffs in *Clapper.*  And that's the case here, Your Honor.
25 | The settlement removed the application and any threat of harm

1    as to Olympus Spa.

2        Now, one other point I'd like to make, Your Honor, on this

3    issue is that this is not a pre-enforcement challenge, as

4    plaintiffs would allege.  This is a post-enforcement case.

5    It's a post-enforcement case that was settled.  Olympus Spa

6    is just another member of the public -- of the general

7    public, and generally, members of the public can't walk into

8    court and say, "I'm going to violate -- I'd like to violate

9    this statute.  Can the Court tell me if I can do it or not?"

10        That's essentially what Olympus Spa is trying to do here.

11    And so it's important to note, Your Honor, that none of the

12    pre-enforcement cases that Olympus Spa cites in its briefing

13    involve an agreement to settle the very facts alleged in the

14    Complaint.

15        Now, turning to the redressability issue, Your Honor, in

16    other words, can this Court issue a remedy that would redress

17    plaintiffs' alleged harm, and the answer, again, is "no."

18    The plaintiffs admit that they're not challenging here the

19    settlement agreement or the mutual exchange of promises in

20    that settlement agreement.  And the agreement -- that

21    agreement, again, ended any case or controversy, so there is

22    no harm to redress.

23        Again, if the Court looks at the case cited in our

24    briefing, *Drake v. Obama*, that is similar to this case here.

25    In *Drake v. Obama*, there was a window that closed with the

1    ending of the -- with the ending of the 2008 presidential

2    election that closed the plaintiffs' window to challenge the

3    law -- or to challenge the election.  Here, the settlement

4    agreement closed Olympus Spa's window.

5         So just to summarize the standing issue, Your Honor,

6    there's no judiciable case or controversy here, because

7    there's no actual or imminent harm.  There's no harm that was

8    caused by HRC, and there's no remedy that the Court could

9    redress -- could provide that would redress Olympus Spa's

10   alleged harm.  So there's no standing for any of the

11   plaintiffs, including the individual plaintiffs, Your Honor,

12   because, again, they never suffered any harm, and they don't

13   suffer any imminent harm.  So this Court should dismiss

14   plaintiffs' Complaint with prejudice.

15        Turning to the merits, Your Honor, HRC also moves this

16   Court to dismiss plaintiffs' Complaint with prejudice under

17   Rule 12(b)(6) for failure to state a claim.  So the Eleventh

18   Amendment here, Your Honor, bars damages against state

19   officials for violating 42 U.S.C. 1983.  So they -- so

20   plaintiffs have no claim for damages, even nominal damages.

21        As for their claims -- there are three claims -- U.S.

22   Supreme Court precedent bars declaratory and injunctive

23   relief for those claims, as well.

24        And before I get into that, Your Honor, I'd like to make

25   two quick points:  Number one, constitutional rights are not

 1   unlimited.  When people enter into the public commercial

 2   sphere, they all must comply with the balance of rights that

 3   the Legislature has constructed.

 4       Number two, this case is not unique.  There are

 5   transgender bathroom access cases throughout the country that

 6   have been based on unfounded safety and privacy concerns, and

 7   those cases have largely failed as sex discrimination.

 8           THE COURT:  Let me interrupt you there.  Do you not

 9   see --

10           MR. LUNA:  Yes, Your Honor.

11           THE COURT:  -- any factual differences between those

12   cases and the case before the Court?

13           MR. LUNA:  In the sense that a transgender female

14   would be in a place where others or herself may be in a state

15   of undress, I think those cases are similar.  And, also,

16   there is no -- also, there's no -- there's no evidence at all

17   of any sort of safety or privacy concerns because a

18   transgender woman is in the same place as others where they

19   may be undressed.

20           THE COURT:  Okay.  You can continue.

21           MR. LUNA:  Thank you, Your Honor.  Thank you.

22       Turning to the free exercise of religion claim, the

23   Supreme Court of the United States has said that the free --

24   one's free exercise of religion may be limited by a valid

25   neutral law of general applicability.  And the Washington

1    Supreme Court, Your Honor, has said that the WLAD is just
2    such a law.  Specifically, the WLAD's public accommodations
3    provision is a valid neutral law of general applicability,
4    because it does not specifically target religious conduct.
5    Rather, the WLAD targets discriminatory conduct regardless of
6    the motivation whether it's religious or tradition or custom
7    or personal distaste or ignorance or any other reason.
8        The issue here, then, is a rational-basis review.  It's
9    whether the WLAD is plausibly related to the State's
10   interests in eliminating discrimination in places of public
11   accommodation.  And the answer was provided by Arlene -- the
12   *Arlene Flowers* case by the Washington State Supreme Court,
13   and it's "yes."
14       Now, even if this Court were to apply strict scrutiny, the
15   WLAD is narrowly tailored to further the government's
16   compelling interest in eradicating discrimination.  The U.S.
17   Supreme Court, the Washington State Supreme Court, and the
18   Washington Legislature have all stated that eradicating
19   discrimination is a compelling state interest.  Public
20   accommodation laws serve that interest in the
21   least-restrictive way, because according to the U.S. Supreme
22   Court, the least-restrictive means of ending discrimination
23   is to prevent it or to prohibit it, and that's what the WLAD
24   does here, regardless of one's religious viewpoint.
25       As to the free-speech claim, the plaintiffs admit that the

1    Jane Doe plaintiffs have no free-speech claim, so this Court

2    should grant HRC's motion to dismiss as to them for this

3    claim.

4        And Olympus Spa's owner -- Olympus Spa, itself, its owner

5    and its president also do not have a free-speech claim.

6    Justice Thomas recognized that public accommodation laws

7    regulate discriminatory conduct, not speech, and therefore,

8    do not abridge free speech, even if they incidentally burden

9    it, and the WLAD is no different.

10       Here, Olympus Spa's "biological women only" language

11   violates the WLAD, because it discourages customers from

12   accessing spa services based on a protected class.

13   Washington, again, has a compelling interest in seeing that

14   everyone -- ensuring that everyone, regardless of gender

15   identity, has equal access to publicly-available goods and

16   services.

17           THE COURT:  Well, does it make any difference that

18   they're not actually sticking with the "biological women"

19   language anymore?  I thought that the current proposal would

20   be that transgender women would be allowed in as long as

21   they'd had the adaptive surgery.  Does that make a difference

22   to your argument?

23           MR. LUNA:  Yes, Your Honor.  We don't think that

24   having surgery should be a requirement to accessing a spa.

25   Transgender women, regardless of their -- regardless of

1  whether they've had gender-affirming surgery or not, are

2  women, whether -- and biological or not, they're women, and

3  they deserve the same sort of access to the healing spa

4  services that Olympus Spa provides.

5     Your Honor, turning to the free -- did I answer your

6  question, Your Honor?

7        THE COURT:  Yes, you did.  I just want to make sure

8  we're both aware that we're not talking anymore about the

9  biology language.  We've moved on from that.

10        MR. LUNA:  Well, yeah, because they've eliminated it

11  from their website, correct.

12     Turning to their free-association claim, Your Honor, the

13  First Amendment does not protect the commercial transactional

14  relationship between and among Olympus Spa's employees and

15  patrons.

16     The free-association clause, rather, protects those

17  intimate and personal relationships, such as the choice of

18  one's spouse or the choice of school for one's child.  It

19  also protects those gathering to redress grievances, for

20  example, or to practice religion or to engage in protected

21  speech, and plaintiffs cannot and do not allege that Olympus

22  Spa 's purpose is to advance a political or religious

23  viewpoint.  Women go to Olympus Spa, I believe, to exchange

24  money for spa treatments, to obtain spa treatments.  And some

25  treatments -- some of those spa treatments may be rooted in

1 Korean tradition, but others are not.

2     Now, plaintiffs also allege a hybrid rights claim, but in

3 order to allege a valid hybrid rights --

4         THE COURT:  You don't have to argue the hybrid rights

5 claim.

6         MR. LUNA:  Thank you, Your Honor.

7     So, just to sum up quickly, Your Honor, there was never,

8 in 20-plus years, never any enforcement against any

9 individual plaintiffs.  The Eleventh Amendment bars damages.

10 The HRC and Olympus Spa chose to settle the claim or

11 controversy.  The Supreme Court of the United States

12 precedent bars the constitutional claims, and so this -- so

13 HRC moves this Court to dismiss plaintiffs' Complaint in its

14 entirety with prejudice.  Thank you, Your Honor.

15         THE COURT:  Ms. Tribbett, whenever you're ready.

16         MS. TRIBBETT:  Thank you, Your Honor.  May it please

17 the Court.

18     Plaintiff brings suit under Section 1983 for redress of

19 the actions and policies of the Human Rights Commission in

20 carrying out their duties under WLAD.  Plaintiffs' loss of

21 First Amendment rights -- the right to speak, speak freely,

22 and have such speech reflect their religious tenets -- have

23 been abridged through misapplication of a neutral law of

24 general applicability.

25     Because the owners of Olympus Spa entered the marketplace

1    does not mean they forgo all First Amendment freedoms.  The

2    right to state the nature of the business in the spa offering

3    ought not to be subject to the favored speech of the State.

4    By forcing the plaintiffs to remove the term "biological"

5    from their website, the defendant abridged the First

6    Amendment freedoms of the plaintiffs.  It is the redress of

7    these rights for which plaintiff seeks relief from the Court.

8         Plaintiff has a colorable claim of violation of the First

9    Amendment speech because they were forced to change the

10   speech on their website or face litigation by the Attorney

11   General's Office.  Court precedent under *Cruz v. FEC* shows a

12   colorable claim traceable to the actions of defendant.

13        Plaintiff did not settle the complaint of Haven Wilvich.

14   The complaint was not properly investigated.  The Human

15   Rights Commission, in lieu of referring the case to the

16   AG's Office, tethered the forgoing of prosecution to the

17   forgoing of free speech as follows:

18        One, Olympus Spa was forced to remove language deemed

19   offensive by the Human Rights Commission.  The term

20   "biological" was compelled to be removed.  The speech and

21   beliefs plaintiffs were forced to undertake were not its own.

22   The censoring of speech did not achieve the narrowly-tailored

23   goal of WLAD to remedy discrimination, because it left

24   appreciable damage to other protected classes; namely, men

25   and those under the age of 13.  By favoring some groups over

1  others and forcing speech, the Human Rights Commission

2  approved the message it desired and favored certain classes.

3      The Human Rights Commission attempted to police thought by

4  forcing Olympus Spa to review the literature and printings of

5  the Human Rights Commission regarding one class of persons:

6  gender -- transgender individuals.

7      The Human Rights Commission forced Olympus Spa to forgo

8  additional speech by submitting to review of their policies

9  and procedures for approval in accord with the Human Rights

10  Commission's view on gender ideology, while, again, forgoing

11  any other speech regarding men or other protected classes.

12  These were the three agreements within the settlement.

13      The facts of this case are important for the Court.  It's

14  important to note that Haven Wilvich stated in the complaint

15  that the owner of Olympus Spa denied her entry.  Upon review

16  of the facts and by the owner's firsthand testimony, this

17  assertion was called into question; that is to say that

18  Olympus Spa presented sufficient evidence and proof that

19  Haven Wilvich had not entered the spa, and Olympus Spa

20  requested the specific dates such allegations occurred.

21  Rather than answering or further investigating the specific

22  alleged event, through Ms. Imiola, the Human Rights

23  Commission stated that "the time for Haven Wilvich to not

24  feel discriminated against has passed" and went on to thinly

25  veil a threat of suit by the AG's Office.

1    Despite plaintiffs' best attempts to assist in the

2  investigation of the complaint, the Human Rights Commission

3  diverged from the facts before it and entered into the

4  unchartered waters of speech and thought policing.  The

5  plaintiff was under threat of loss regardless of the course

6  chosen, either risk litigation because of the Human Rights

7  Commission not furthering the investigation of the

8  unsubstantiated allegation of entry denial or forgo a

9  constitutional right to speak in accord with their faith.

10  This threat of harm was similar to that held to constitute

11  sufficient standing in *Cruz v. FEC*.

12    Under Article III, the plaintiffs do have standing,

13  because the injury to plaintiffs' First Amendment freedoms

14  resulted from both a threatened misapplication of WLAD to a

15  place of quasi-public accommodation or -- and the actual

16  misapplication of WLAD to the First Amendment freedoms of the

17  plaintiffs.

18    Plaintiffs' injury is directly attributable to the

19  misapplication of WLAD to their free speech rights to publish

20  on their website their ideas, their business purposes, and

21  their beliefs.  By forcing plaintiffs to remove the word

22  "biological," the State violated the free speech rights of

23  plaintiffs.

24    This is differentiable to *Masterpiece Cakeshop* and

25  *Arlene's*, because the actual speech required to be removed

1  was "biological."  The former cases did not involve speech,

2  but artistic expression that each business owner stated was

3  speech.  Here, the actual language of the website was changed

4  on the content -- based on the content to reflect the

5  preference of the Human Rights Commission towards one class

6  of persons:  Gender-identity class.

7        In *Cruz* v. FEC, the Court stated, "This Court has never

8  recognized an exception to Article III standing's

9  traceability requirement for injuries that a party purposely

10  incurs."  By entering into agreement, the plaintiff did not

11  forgo the rights to challenge the violation of free speech

12  rights.

13        Here, the plaintiffs' First Amendment injuries are

14  directly traceable to the Human Rights Commission.  The Human

15  Rights Commission failed to properly investigate the

16  complaint, as alleged, and instead shifted to threatening a

17  suit by the Attorney General's Office or compelling speech

18  and making the plaintiffs speak, think, and act in a manner

19  not in accord with the First Amendment protections.

20        The defendant states that the plaintiff lacks standing to

21  seek relief because the rights asserted are conjecture and

22  loosely tethered to future events that may or may not happen.

23  In reality, the threatened enforcement was tethered to events

24  that may or may not have happened.  Haven Wilvich never

25  entered Olympus Spa, as evidenced in the exhibits presented

by the complaint.

Because the Human Rights Commission stated that the time
to ensure that Haven Wilvich did not feel discriminated
against had passed, the Human Rights Commission refused to
investigate the complaint and embarked on speech policing.
Such powers are found nowhere in the authority given to it
within the WLAD.  Plaintiff was then forced to speak in a
manner that violated their First Amendment rights and removed
the term "biological" from their website.

By pushing the boundaries of its jurisdiction and
trampling the First Amendment rights of plaintiff, the Human
Rights Commission has brought the issue before the Court
under the very same circumstances it alleges prove a lack of
standing and failure to allege risk of imminent harm on the
part of plaintiff.

Plaintiff can and does show that their First Amendment
freedoms were injured when the speech on their website was
required to be changed.  The Human Rights Commission forced
them to forgo their constitutional freedom or face the threat
of litigation from the AG's Office.  The compelled speech and
harm to plaintiffs' First Amendment protections is directly
traceable to the Human Rights Commission, and a favorable
decision would redress the harm to the First Amendment
protection the plaintiffs have forgone in publishing their
own speech on their website.  That is the term "biological."

1    What is more, plaintiff has not promised to conduct their

2   business and to allow pre-operative gender -- pre-operative

3   gender-nonconforming individuals into the spa.  They simply

4   removed "biological" from their website.

5    They reviewed information sent to them by the Human Rights

6   Commission and allowed the Human Rights Commission to review

7   their policy and procedures.  Three requirements of the

8   settlement required one active and two passive actions

9   revolving around speech and thought police.

10           THE COURT:  Can I interrupt you and ask:  What is the

11   position now of the spa?  Are they allowing post-operative

12   transgender women?

13           MS. TRIBBETT:  Yes, Your Honor.

14           THE COURT:  Okay.

15           MS. TRIBBETT:  They always have.  That was -- if you

16   look through the exhibits in the complaint, that was

17   specifically stated by Olympus Spa.  They have always allowed

18   post-operative transgender females into the spa.

19    Is that what you asked me?  I'm sorry, did I mistake your

20   question?

21           THE COURT:  That's what I asked, because you were

22   concentrating on biological, and I didn't think that was

23   really, at this point, the issue, because they have moved on

24   to a different position, right?

25           MS. TRIBBETT:  They still do not allow pre-operative

1 transgender women, nor men, nor children under the age of 13,

2 into the spa.

3          THE COURT:  All right.

4          MS. TRIBBETT:  May I continue, Your Honor?

5          THE COURT:  Please.

6          MS. TRIBBETT:  The speech rights at issue are ripe

7 for review, present issues of material fact, and satisfy

8 standing.  To say that the Human Rights Commission has a

9 compelling interest in removing the word "biological" from

10 the website of plaintiff and to control the speech and

11 policies and procedures of plaintiff to ensure that one

12 protected class of persons are not denied entry to a spa

13 where nudity is a requirement would be a stretch.

14     To achieve the goals of the WLAD, the Human Rights

15 Commission is charged with ensuring that discrimination does

16 not occur.  The HRC's actions are not narrowly tailored to

17 achieve that goal, and appreciable damage to other protected

18 classes remain.

19     The WLAD states that gender --

20          THE COURT:  Wait a minute.  If you were to prevail in

21 this suit, you wouldn't go back to putting the word

22 "biological" in, would you?

23          MS. TRIBBETT:  Yes, Your Honor, that is a free-speech

24 right that has been abridged, for the plaintiffs to be able

25 to speak freely, as they desire, on their website.

1   THE COURT:  But I thought you had moved on from

2   "biological."  You'd moved on to saying that "post-operative

3   women" or "transgender women" would be allowed.

4   MS. TRIBBETT:  Yes, post-operative women have always

5   been allowed in.

6   THE COURT:  Okay.

7   MS. TRIBBETT:  So perhaps "biological" would be an

8   improper term, but pre-operative transgender women are not

9   allowed in.  Post-operative would be.  I think it gets more

10  to the heart of being forced to remove certain language from

11  the website.

12  THE COURT:  All right.  You may continue.  Go ahead.

13  MS. TRIBBETT:  Additionally, to say that the Human

14  Rights Commission has a compelling interest in whether or not

15  specific terms appear on the website of the plaintiffs is not

16  narrowly tailored to achieve the goals of WLAD while eroding

17  First Amendment protection's guarantee.

18  The Human Rights Commission is not applying WLAD in a

19  neutral manner by compelling speech to afford one protected

20  class access to a spa, which has always discriminated on the

21  basis of sex and gender.  A compelling interest cannot be

22  achieved by compelling speech to be more inclusive of one

23  group while leaving appreciable damage to others.

24  Olympus Spa is not open to the public at large and never

25  has been.  The Human Rights Commission all but admits this,

1    that Olympus Spa is a place of quasi-public access, by not

2    mentioning or taking issue with the discrimination on the

3    basis of gender or age.  If the Human Rights Commission had

4    such interests, they would be required to police the speech

5    of all websites and spas.  Such policing would show that

6    there are a variety of places which do discriminate on the

7    basis of biological identity via the web.  A short list:

8    With strip clubs, sororities, fraternities, drug-treatment

9    centers, and other spas.  Because other speech remains intact

10   that discriminates, compelling interest is not achieved.

11       While it is true that the Human Rights Commission

12   investigates complaints, the complaint was not investigated.

13   The Human Rights Commission ignored evidence showing Haven

14   Wilvich was never denied entry, and the Human Rights

15   Commission shifted the focus of the investigation to compel

16   certain speech and suppress other speech.  Violation of the

17   First Amendment is not narrowly tailored to achieve the

18   compelling interest of the WLAD when it protects only

19   gender-nonconforming individuals.

20       Government regulation of speech is content-based if a law

21   is applied to a particular speech because of the topic

22   discussed where the idea or messages rest.  Content-based

23   regulations target speech based on communicative content, and

24   that is *Reed v. Town of Gilbert*.  As a general matter, such

25   laws are presumptively unconstitutional and may be justified

1    only if the government proves that they are narrowly tailored

2    to serve compelling state interests.  This stringent standard

3    reflects the fundamental principle that governments have no

4    power to restrict expression because of its message, its

5    ideas, its subject matter, or its content.

6        Enforcement of a regulation is content-based if it draws

7    distinction based on the message a speaker conveys.  Here,

8    the message conveyed was with regard to ideology.  The Human

9    Rights Commission was perfectly fine with discrimination as

10   to men and did not find issue with the gender discrimination,

11   but directly targeted the speech because of the message it

12   conveyed regarding gender identity.  Because the Human Rights

13   Commission is policing the content of the speech on Olympus's

14   website based on its subject matter with regard to the

15   message as against one class, it is subject to strict

16   scrutiny.

17       The actions of the Human Rights Commission are not

18   narrowly tailored to achieve the ends of WLAD; that is, to

19   ensure that places of public accommodation do not

20   discriminate against protected classes.

21       The Human Rights Commission discriminated against the

22   viewpoint of Olympus Spa and regulated them based on

23   motivating ideology, opinion, and religious perspective of

24   Olympus Spa vis-à-vis the Human Rights Commission's desire to

25   protect one class of persons.  This is a more blatant and

1    egregious form of content-based regulation, because it is not

2    aimed at eradicating gender discrimination, but of

3    controlling speech, thought, ideology, and rights to

4    association as it related to gender-nonconforming

5    individuals.  Because the speech is limited to gender

6    ideology, not gender discrimination, it's based on the

7    subject matter, and that is subject to strict scrutiny.

8        The Human Rights Commission's preference reflects class

9    preference.  The Human Rights Commission targeted Olympus Spa

10   not because Haven Wilvich was denied entry, but because of

11   the content of the speech on their website, which could have

12   discouraged entry.  The same language exists today, which

13   would discourage entry on the basis of gender and age and

14   which the Human Rights Commission took no issue with.

15             THE COURT:  I think I've got the gist of that

16   argument, Counsel.

17             MS. TRIBBETT:  All right.

18             THE COURT:  If you want to go on to any of your

19   others, please do.

20             MS. TRIBBETT:  Your Honor, even if the Court chooses

21   to adopt the idea that all -- that Olympus Spa is a place of

22   public accommodation, which we contend that it is not,

23   because we have never -- Olympus Spa has never allowed men

24   into its spa, nor children under the age of 13, because

25   nudity is required.  It is not a traditional spa where there

1   are a variety of different services where you are clothed,

2   where there are towels, that you would normally find at a

3   traditional spa.  This spa, you are completely nude once you

4   enter into the treatment areas the entirety of the time.

5        To say that the Human Rights Commission has -- had an

6   interest in allowing men or pre-operative transgender women

7   to be naked to, you know, obtain such treatments stretches

8   WLAD beyond its intent and deprives women and workers at

9   Olympus Spa, and the owners, of the right to freedom of

10  association, freedom of speech, and their sincerely-held

11  religious beliefs.  Thank you, Your Honor.  That is all.

12              THE COURT:  Thank you.

13       You have your five minutes, Counsel.  You are on --

14              MR. LUNA:  Thank you, Your Honor.  Sorry.  You would

15  think, with two or three years now of Zoom hearings, that I

16  would be -- that that mistake would not occur, but it does.

17       A couple of points -- a few points, Your Honor.  First of

18  all, Olympus Spa argues that the Human Rights Commission is

19  favoring men, and that is not true.

20              THE COURT:  You -- well, go ahead.

21              MR. LUNA:  Okay.  I'll move on.  The *Cruz* case --

22  opposing counsel brought up the *Cruz* case a couple of times,

23  and I just wanted to make sure that I responded to that.

24  Again, with Senator Cruz, he triggered the statute with his

25  alleged self-inflicted harm, and he was still -- the

1  important point is that he was still subject to the statute

2  because of the harm that he had incurred in donating to his

3  campaign.  Here, the settlement agreement took Olympus Spa

4  out of HRC's, quote, sort of, line of fire.

5          THE COURT:  Well, let me ask you about that

6  settlement agreement.

7          MR. LUNA:  Yes.

8          THE COURT:  As I go over the record, counsel is

9  correct that there was no investigation done before the

10  settlement agreement; is that correct?

11          MR. LUNA:  Well, Your Honor, I'm not sure that that's

12  true.  I think that there was some investigation in -- I know

13  that there was an investigator assigned, for example, and I

14  don't know exactly what that investigator did.

15          THE COURT:  Well, let me ask you a question.  If it's

16  true that there was no investigation -- I'm going to put you

17  on the spot to tell me.

18          MR. LUNA:  Okay.

19          THE COURT:  You may not have anticipated this, but if

20  it's true that the Court concludes that there was no

21  investigation done, but that the individual who spoke to the

22  spa's owners threatened referral to the Attorney General and

23  prosecution without an investigation, does that strike you as

24  undue pressure to settle this case?

25          MR. LUNA:  Well, no, Your Honor, and I'll make two

1    points there.  Number one, Olympus Spa was given a few

2    chances to respond to the -- to Haven -- to Ms. Wilvich's

3    complaint, and they did so.  And so based on those responses

4    and in interviews conducted by the investigator, there was

5    some investigation and -- and, again, Olympus Spa was given a

6    voice.  And so based on the complaint and based on the facts

7    provided by Olympus Spa, I think -- well, not "I think" --  I

8    know that, even though the Human Rights Commission had not

9    entered formal findings of discrimination against --

10           THE COURT:  Well, she didn't give -- the person who

11   was in charge of this didn't even refer to the investigative

12   tribunal; isn't that correct?

13           MR. LUNA:  They did not pursue an enforcement action

14   against Olympus Spa.  This was a pre-finding settlement,

15   correct, Your Honor.

16           THE COURT:  Well, they not only didn't pursue,

17   correct, they didn't refer it to a full-fledged

18   investigation, right?  Well --

19           MR. LUNA:  Yeah, all I know, Your Honor, is that

20   Olympus Spa was given a couple -- at least two or three

21   chances to respond to the complaint.

22           THE COURT:  Okay.  And my other question is:  Are you

23   troubled by the fact that involved here is -- certainly going

24   to your standing argument -- is the fact that the nature of

25   this business involves a certain amount of nudity, and in its

1   nature, it's different factually from the other cases that

2   you've cited here and in your brief in the fact that

3   plaintiff has alleged that people won't come and frequent

4   their business if pre-operative women are permitted, given

5   the need for nudity in the course of treatment at the spa?

6          MR. LUNA:  Your Honor, I want to acknowledge that --

7   I want to acknowledge that there will be some who find it

8   uncomfortable to have a pre-operative transgender woman in

9   the spa.

10      That being said, I think that is the very reason we have

11  an antidiscrimination law in public accommodations, Your

12  Honor, quite frankly.  It is to prevent -- or it is to ensure

13  that everyone, regardless of gender, has access to goods and

14  services that everyone else has on an equal basis and --

15  and -- to prevent and eliminate discrimination based on

16  unfounded stereotypes.

17      And the other thing I would say, Your Honor, is that

18  nudity does not govern -- or it's not a -- being nude in a

19  place of public accommodation is not the type of intimate,

20  personal relationship that, for example, the free-association

21  clause would protect.

22      And just like in those bathroom cases, Your Honor, that

23  were not cited in the brief, but just like in those that I

24  raised in oral argument earlier, there are simple remedies

25  that Olympus Spa could implement, just as the bathroom and

1    locker rooms do at the schools, to both comply with the WLAD

2    and their religious beliefs.

3            THE COURT:  Well, Ms. Tribbett, I'm going to ask you:

4    I don't think there's a claim that you've articulated about

5    whether this would have an economic effect either on people

6    losing their jobs or on the way the spa could or couldn't

7    operate, but do you think that -- obviously, if we're just

8    talking about discomfort, that's not going to win the day,

9    because discomfort is no reason to overcome a law, a neutral

10   law like this, but do you think there's any factual

11   differences between this and the bathroom cases?

12           MS. TRIBBETT:  Definitely, Your Honor.  People do not

13   pay to use the bathroom.  There's no exchange of goods and

14   services.  There's no expectation of nudity, generally

15   speaking.

16       Now, in the locker room, when you are changing, you do

17   have to be nude to change, but you are not nude for the

18   entirety of the service.  And when I say that Olympus Spa

19   requires nudity, you have one robe, which you disrobe when

20   you enter into the treatment facilities, and you are nude the

21   entirety of the time, with no towels and nothing to cover

22   you.

23       While -- one of the treatments, such as jjimjilbang, you

24   are lying nude on the massage table.  They are lined up

25   six-by-two, for 12 tables total.  For a woman to have to work

1    on or to be paid to work on a pre-operative transgender woman

2    or even a male -- again, we're talking about discrimination.

3    The spa discriminates against, for lack of a better word,

4    penis-presenting individuals.  They discriminate against men,

5    which the Human Rights Commission takes no issue against,

6    but --

7           THE COURT:  Ms. Tribbett, that is -- I'd advise you,

8    that's not your strongest argument.

9           MS. TRIBBETT:  Understood.  There will be economic

10   damage to the business.  The entirety of the business is

11   based upon traditional Korean treatments.  To begin allowing

12   pre-operative transgender women into the spa would have a

13   deleterious effect on the economics, and they would lose

14   their employees as well, who would be out of a job from

15   people's discomfort, and the quality of the treatment would

16   suffer as well.  So, yes, there would be appreciable economic

17   damage.

18          THE COURT:  Mr. Luna, I don't know if you have any

19   comments left in your rebuttal.  Do you?

20          MR. LUNA:  Just in response to what Ms. Tribbett just

21   said.  Again, the complaint alleges only one instance of a

22   transgender -- a pre-operative transgender woman accessing

23   the spa services, which did not result in any HRC

24   enforcement, and so the harm is speculative here.  It's much

25   more speculative than what opposing counsel is alleging.

1    Just to wrap up, Your Honor, you know, if religious

2 beliefs, free-speech rights, or the right of association

3 justified a public business to ignore antidiscrimination

4 laws, you know, such laws would be left with little effect,

5 and our state, our country, would not be as far along as it

6 is or would not have made the amount of progress its made

7 toward eradicating discrimination.

8    So HRC respectfully asks, Your Honor, that this Court

9 dismisses plaintiffs' complaint with prejudice in its

10 entirety.

11        THE COURT:  Thank you very much.

12    Counsel, I want to thank both of you for excellent

13 arguments.  It's been helpful to the Court, and I appreciate

14 your careful thought and preparation.

15    I will try to get you a decision as soon as possible,

16 okay?

17        MR. LUNA:  Thank you, Your Honor.

18        MS. TRIBBETT:  Thank you, Your Honor.

19        THE COURT:  All right.  Court will be adjourned.

20            (Adjourned.)

21

22

23

24

25

0

1

2                          C E R T I F I C A T E

3

4

5       I, Sheri L. Schelbert, RMR, CRR, do certify that the

6    foregoing is a correct transcript, to the best of my ability,

7    from the record of proceedings in the above-entitled matter.

8

9

10   */s/ Sheri Schelbert*

11   Sheri Schelbert

12

13

14

15

16

17

18

19

20

21

22

23

24

25